In the

# United States Court of Appeals
## For the Seventh Circuit

————————

Nos. 06-2680, 06-2963 & 06-3114

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

WILLIE WATSON, ANTHONY REDMOND,
and TRACY REDMOND,

*Defendants-Appellants.*

————————

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 CR 48—**Matthew F. Kennelly**, *Judge*.

————————

ARGUED OCTOBER 22, 2007—DECIDED MAY 13, 2008

————————

Before KANNE, EVANS, and WILLIAMS, *Circuit Judges*.

WILLIAMS, *Circuit Judge.* These three defendants were
convicted of robbing an armored car outside a Chicago
bank. They shot a guard three times at point-blank range
(thankfully, he survived) and made off with $400,000
in cash. One of them, Willie Watson, pleaded guilty to
aiding and abetting Hobbs Act robbery, 18 U.S.C. §§ 1951,
1952; the other two, brothers Anthony and Tracy Redmond,
went to trial and were found guilty of Hobbs Act robbery,
conspiracy to commit the same, and using a firearm dur-
ing and in relation to the robbery, *id.* § 924(c). On appeal

Tracy Redmond argues that evidence was improperly
admitted in violation of Federal Rule of Evidence 804(d)(3)
and the Confrontation Clause of the Sixth Amendment,
and Anthony Redmond argues that the indictment listed an
impermissible theory of federal jurisdiction, tainting
the jury's verdict. The district court did not abuse its
discretion in admitting the evidence, and even if it did,
any error is harmless; and the chances of the indictment
influencing the jury are negligible. We therefore affirm
the judgment of the district court.

## I. BACKGROUND

According to the government's evidence at trial, Tracy
Redmond actually committed the robbery and shot the
guard, while Watson was the driver and Anthony rode
along. After the robbery, the three drove away in their
stolen van and switched to a different car to avoid detec-
tion; Anthony drove that car. But they weren't as smooth
in their post-robbery execution as they were in their pre-
robbery planning. Anthony left a cigarette butt in the
van as well as a soda can containing his saliva. Police later
used these to link him to the robbery. Moreover, in
the days following the heist, the defendants splurged.
Tracy bought himself two cars and made $9000 in im-
provements to them, and Anthony bought a car of his own.

A fourth person—an insider—facilitated the robbery,
and her apprehension by police officers led to the gang's
downfall. Estella Suttle, who is not a party to this appeal,
was a teller at the bank that had hired the armored car.
Among other things, she told the defendants about the
bank's security camera system. But after the robbery,
she boasted to the wrong guy—an FBI informant. Suttle

was arrested and agreed to cooperate with the authorities; she ultimately pled guilty herself. Officers concocted a ruse, directing Suttle to call Anthony (whom she was dating) and tell him, falsely, that she had seen a news report that "they identified the shooter." Anthony did not express surprise or ask which crime she was referring to, and after their brief call he called Tracy. That call was not recorded. Later that night, Anthony visited Suttle and, as the FBI recorders rolled, the two had a wide-ranging conversation. Anthony said that he had spoken to Tracy, and that the two believed the news report to be a plant by the bank in order to fluster the culprits. Anthony said that Tracy's face had been too well concealed for an identification: "I think it was just kinda a bit impossible for them to, like identify him . . . because . . . the whole face was covered . . . his hair was up in his hat, he had his hat up over his face." Anthony then made a statement that was eventually used as evidence of *Tracy*'s involvement:

> I don't know what's going on but I mean, you know like when I told Dough [Tracy] he was like no they can't identify me. Period. You know, so I don't know. You know but I told him, I said look, I don't know, I'm telling you what she told me, so be careful, be alert, watch your back, you know all that, you know cause you just never know . . . . I mean, a bank robber, come on man . . . . They identify you? They're gonna come get you, period.

At trial, both Suttle and Watson testified for the government. The Redmond brothers were found guilty and sentenced to 256 months' imprisonment (Tracy) and 190 months' imprisonment (Anthony). Watson and the Redmonds then appealed.

## II. ANALYSIS

We address Tracy Redmond's arguments first, and then turn to those raised by the other defendants.

### A.  Tracy Redmond

The principal argument on appeal is Tracy Redmond's challenge to the admission of Anthony Redmond's statement discussed above. When Anthony went to visit co-schemer Suttle in response to her (false) assertion that she had seen a news report in which police boasted they had identified the gunman, Anthony said some things that were ultimately used to tie Tracy to the robbery. Anthony told Suttle that Tracy said that he (Tracy) could not possibly have been identified because he had worn a mask during the robbery. Tracy challenges the admission of this evidence under both Federal Rule of Evidence 804(b)(3) and the Confrontation Clause. We review the former argument for an abuse of discretion, *United States v. Loggins*, 486 F.3d 977, 981 (7th Cir. 2007), and the latter *de novo*, *United States v. Castelan*, 219 F.3d 690, 694 (7th Cir. 2000).[1]

### 1.  Admission of the evidence did not violate Rule 804(b)(3)

Hearsay evidence like Anthony's surreptitiously recorded, out-of-court statement is generally inadmissible

---

[1] The government contends that in the district court, Tracy did not challenge the admissibility of Anthony's statement under Rule 804(b)(3), and that our review should be for plain error only. The government is incorrect: Tracy made this argument at record entry 104.

because it is not sworn testimony, its admission prevents juries from evaluating the speaker's credibility, and the opposing party cannot cross-examine the speaker. *See* Fed. R. Evid. 802; *Williamson v. United States*, 512 U.S. 594, 598 (1994). One of the many exceptions to the hearsay rule, however, applies to statements against the declarant's interest. Most people would not say that they knocked over a bank, spit on a policeman, or shoved their mother if it wasn't true. Hence Rule 804(b)(3) provides for the admission of

> A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, *or so far tended to subject the declarant to* civil or *criminal liability*, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true.

(Emphasis added). In evaluating a district court's decision to admit evidence under this rule, courts look at three factors: whether (1) the declarant is unavailable to testify at trial; (2) the statement was against the declarant's penal interest; and (3) the circumstances suggest that the statement is trustworthy. *United States v. Leahy*, 464 F.3d 773, 797-98 (7th Cir. 2006).

Tracy concedes that Anthony was "unavailable" under factor one because Anthony chose not to take the stand. But Tracy argues under factor two that Anthony's statement—while concededly bad for Tracy—was not against *Anthony*'s interest when made. Tracy points out that under *Williamson*, our inquiry must be confined to the admissibility of a particular statement; we cannot simply admit all neutral statements that precede or follow a state-

ment that is truly against the declarant's interest. *See also United States v. Bonty*, 383 F.3d 575, 579 (7th Cir. 2004). This limitation is significant in this case because Anthony clearly exposed himself to criminal liability at various points in his conversation with Suttle. For instance, he gave a firsthand account of the way Tracy wore his mask during the robbery. Yet as the Court observed in *Williamson*, we must still evaluate the statement sought to be admitted "in light of all the surrounding circumstances." 512 U.S. at 604. This latter language shows that we must be mindful of the context in which a statement is made. *See also id.* at 606 (Scalia, J., concurring).

The district court did not abuse its discretion in concluding that Anthony's statement was against his penal interest. The paragraph that Tracy challenges does not make sense in a vacuum. Take, for instance, this phrase: "when I told Dough [Tracy] he was like no they can't identify me." Anthony had just (falsely) heard that the police claimed to have identified the shooter in the armored car robbery, and he immediately called Tracy to tell him the same. Thus, "when I told Dough" means, "when I told Tracy that a news report said that the police had identified the shooter in the armored car robbery." While it may be technically possible that Tracy and Anthony just like to listen to the crime blotter and excitedly update each other about unsolved area robberies, in context, Anthony was indicating his inside awareness of the robbery and expressing concern that he and the crew might have reason to fear detection. Similarly, when Anthony said that he had told Tracy, "so be careful, be alert, watch your back, you know all that, you know cause you just never know," in context, this can only mean, "be careful because the police may be on to you as a

perpetrator of the robbery." "Be careful" could theoretically be read as an innocent friend's statement of concern for a guilty friend, but in context, Anthony was saying, "hey, don't get caught because *I* don't want to get caught."

These statements do indeed expose Anthony to criminal liability as a member of the conspiracy. As we noted in *United States v. Westmoreland*, 240 F.3d 618, 626-27 (7th Cir. 2001), "a statement that implicates the declarant in a larger conspiracy tends to subject the declarant to criminal liability and thus is a statement against interest. This is so because a member of a conspiracy is liable for any co-conspirator's act committed in furtherance of the conspiracy" (internal citations omitted). By revealing his inside knowledge of the conspiracy and helping one of its perpetrators avoid detection, Anthony could at the very least be charged with being an accessory after the fact to robbery, 18 U.S.C. § 3; *United States v. Osborn*, 120 F.3d 59, 63-64 (7th Cir. 1997), if not with the more serious crime of aiding and abetting the conspiracy, 18 U.S.C. § 2; *United States v. Irwin*, 149 F.3d 565, 569-71 (7th Cir. 1998).

Tracy also argues that even if Anthony's statement to Suttle was against Anthony's penal interest, the circumstances render the statement untrustworthy. Anthony had gone to talk to Suttle about the news report, and, Tracy emphasizes, Anthony was downplaying to Suttle his own role in the robbery. Suttle was promised $20,000 for giving the crew inside information about the armored car, but instead she only got a few thousand. According to Tracy, Anthony was minimizing his own role in the crime so that he could avoid blame for giving Suttle such a meager cut—"it was Tracy's show," Anthony might have said to Suttle, "so Tracy stiffed you, not me." This argu-

ment does give us some pause. After all, one of the key situations in which a co-defendant's statement against interest is unreliable hearsay is when the co-defendant is shifting blame away from himself and onto another. *See Varela v. United States*, 481 F.3d 932, 936 (7th Cir. 2007). Blaming one's self *and* someone else does not necessarily reduce a statement's trustworthiness, but that is not what Tracy is alleging happened here. On the other hand, the quintessential untrustworthy statement is made to police officers, who offer inducements to an arrested suspect in return for cooperation, *United States v. Ochoa*, 229 F.3d 631, 638 (7th Cir. 2000), whereas here, Anthony thought he was speaking privately to a confederate. Every twist and turn in intra-conspiracy politics should not necessarily undermine the trustworthiness of a private statement between criminal plotters. Thus there are considerations both against and in favor of the trustworthiness of Anthony's statement.

We need not pursue this issue further, for any error in admitting Anthony's statement as evidence against Tracy was harmless. *See Westmoreland*, 240 F.3d at 629. The other evidence of Tracy's guilt was substantial and supported a finding of guilt beyond a reasonable doubt even without Anthony's recorded statement. Both Watson and Suttle cooperated with the government and testified in detail about Tracy's leading role in planning and carrying out the armored car operation. Tracy went on a spending spree immediately after the robbery, buying a car the very next day and making thousands of dollars in improvements to it three days later, and buying another car two weeks later. *See United States v. Ewings*, 936 F.2d 903, 906 (7th Cir. 1991) ("Spending sprees, like other evidence of pecuniary gain, tend to show participation in

crimes where financial enrichment is the motive."). And Tracy's brother's fingerprints and DNA were found all over a stolen van used in the robbery. This evidence supports the jury's verdict of guilt beyond a reasonable doubt, even in the absence of Anthony's recorded statement.

### 2. Admission of the evidence did not violate the Confrontation Clause

Notwithstanding Rule 804(b)(3), Tracy contends that admitting Anthony's statement violated his Sixth Amendment right to confront an adverse witness. In *Crawford v. Washington*, 541 U.S. 36, 68 (2004), the Supreme Court explained that the Confrontation Clause bars the admission of a witness's "testimonial statement" unless the witness is unavailable to testify at trial and the defendant had a prior opportunity to cross-examine him or her. The Confrontation Clause does not, however, apply to statements that are not testimonial in nature. *See Davis v. Washington*, 126 S. Ct. 2266, 2274-75 (2006). While the Court has not comprehensively defined the term "testimonial," it stated in *Crawford* that it extends to "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." 541 U.S. at 68. The Court also added that evidence is "testimonial" in nature when given in formal pleadings, such as affidavits, declarations, or confessions, or—most pertinent here—when "made under circumstances which would lead an objective witness reasonably to believe that the statements would be available for use at a later trial." *Id.* at 52. In short, an "accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquain-

tance does not." *Id.* at 51. The Constitution restricts the admission of the former type of out-of-court statement, while only the rules of evidence restrict the latter.

Anthony's private statement to a confederate, which was secretly recorded, does not fit into any of *Crawford*'s broad categories of testimonial evidence. It certainly was not made to the police in an interrogation, which is the classic type of testimonial evidence the Sixth Amendment seeks to limit. *Id.* at 68 (reversing lower court's admission of evidence made during interrogation at police station). It was not contained in any formal court document, or given as evidence at another proceeding. The closest match would be if Anthony had reasonably believed that the statement would be preserved for later use at a trial, but he couldn't have thought this because he did not know that the FBI was secretly recording the conversation. *See, e.g., United States v. Summers*, 414 F.3d 1287, 1302 (10th Cir. 2005) (proper focus is on whether *declarant* would believe statement would later be used as evidence). A statement unwittingly made to a confidential informant and recorded by the government is not "testimonial" for Confrontation Clause purposes. *United States v. Tolliver*, 454 F.3d 660, 665 (7th Cir. 2006); *United States v. Underwood*, 446 F.3d 1340, 1347-48 (11th Cir. 2006); *United States v. Hendricks*, 395 F.3d 173, 182-84 (3d Cir. 2005); *United States v. Saget*, 377 F.3d 223, 229-30 (2d Cir. 2004).

### 3.  Tracy's sentence was reasonable

Tracy also challenges his sentence, but his arguments are unpersuasive and do not require much analysis. He contends that the district court clearly erred in imposing a two-point enhancement for being an "organizer,

leader, manager, or supervisor," U.S.S.G. § 3B1.1(c), arguing that Suttle was actually in charge. But the district court permissibly credited testimony that Tracy planned the robbery and pressed Suttle for insider details about the bank; brought Watson into the conspiracy; took the largest chunk of the proceeds for himself and decided how the rest should be apportioned; and actually committed the robbery and shot the guard. All of these factors support the district court's decision. *Id.* cmt. n.4; *United States v. Johnson*, 489 F.3d 794, 797-98 (7th Cir. 2007). Tracy also argues that his sentence was unreasonable, but since it was within the Guidelines range we presume it was reasonable, *Rita v. United States*, 127 S. Ct. 2456, 2462 (2007); *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005),[2] and find that the district judge legitimately believed that callously shooting a guard three times and leaving him for dead warranted a stiff punishment.

### B.  Anthony Redmond

Anthony contends that the indictment offered two theories for satisfying the jurisdictional element of the Hobbs Act, and that one of those theories was legally invalid. The indictment first mentioned a "depletion of assets" theory of federal jurisdiction—that by stealing from the armored truck company, which customarily

---

[2] Anthony Redmond does not directly challenge his sentence, but he contends that affording a presumption of reasonableness to a sentence within the applicable Guidelines range is inconsistent with *United States v. Booker*, 543 U.S. 220 (2005). *Rita* had not yet been decided when Anthony filed his brief; it forecloses this argument.

purchases items in interstate commerce, the defendants "limit[ed] the victim-enterprise's potential as a purchaser of goods." *See United States v. Re*, 401 F.3d 828, 835 (7th Cir. 2005). But the indictment also stated an arguable second theory of satisfying the Hobbs Act's jurisdictional element: "The Bank's handling of coin and paper U.S. currency affected interstate commerce, and the coin and paper United States currency which Davis Bancorp delivered to the bank by armored car traveled in interstate commerce."

When an indictment offers two theories of liability and a jury returns a general verdict that does not say under which theory it convicted, the conviction can be imperiled. If the evidence would only support one theory or the other, the jury is presumed to have gone with the better-supported theory, and the conviction stands. But we cannot so credit the jury if one of the theories is *legally* insufficient—if, for instance, the behavior under that theory does not constitute a crime. *See Tenner v. Gilmore*, 184 F.3d 608, 611 (7th Cir. 1999). If in the latter scenario "it is impossible to tell which ground the jury selected," the case must be retried. *Yates v. United States*, 354 U.S. 298, 312 (1957); *see also United States v. Gonzalez*, 93 F.3d 311, 320 (7th Cir. 1996).

Here, the government's second "theory" of jurisdiction—that the money the defendants stole traveled in interstate commerce—is indeed legally insufficient, for if cash could serve as the jurisdictional hook, *any* robbery would be a federal crime under the Hobbs Act. *See United States v. Peterson*, 236 F.3d 848, 855 (7th Cir. 2001). Nevertheless, it is exceedingly unlikely that the jury convicted under this "theory" of jurisdiction, because it was just a one-off line in the indictment that the government never

even mentioned. We do not mean to excuse the government's sloppy drafting; it could have averted this appellate argument with a more carefully worded indictment. But the government's evidence at trial and its closing argument focused exclusively on the legally sound depletion of assets theory. *Cf. United States v. Colvin*, 353 F.3d 569, 577 (7th Cir. 2003) ("highly unlikely" that jury convicted on impermissible ground, because it could not have done so and still convicted on a separate charge). The chances that in establishing federal jurisdiction the jury relied on a line in the indictment that was never mentioned at trial, instead of the proper theory that was advanced and well supported with evidence, are minuscule. On the facts of this case—and in the context of satisfying the *de minimis* connection to interstate commerce—we therefore reject Anthony's argument.[3]

### C. Watson's and Anthony's restitution argument

Finally, Anthony and Watson contend that the district court erred by neglecting to set out a schedule of restitution payments. They concede that the district court properly ordered them to pay $400,000 in restitution, but argue that by simply saying that the payments must begin immediately, rather than giving a schedule of payments, the district court impermissibly delegated a core judi-

---

[3] Tracy and Anthony also contend that under the Constitution, Hobbs Act robbery must have a substantial impact on interstate commerce. Neither develops the argument, so it is waived; and in any event it is a perennial loser. *See United States v. Griffin*, 493 F.3d 856, 861 (7th Cir. 2007); *United States v. Sutton*, 337 F.3d 792, 796 (7th Cir. 2003).

cial duty. But they did not raise this contention below, and our decision in *United States v. Sawyer*, No. 06-1275, ___ F.3d ___, 2008 WL 942653, at *3 (7th Cir. Apr. 9, 2008), decided after oral argument in this case, holds that a district court's failure to set out a restitution schedule is not plain error.

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the defendants' convictions and sentences.