Filed 12/21/15  P. v. Dunbar CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JAQWAN GLEN DUNBAR,<br><br>    Defendant and Appellant. | B259122<br><br>(Los Angeles County<br>Super. Ct. No. TA130397) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Kelvin D. Filer, Judge.  Affirmed in part and reversed in part with directions.

J. Kahn, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Susan Sullivan Pithey, Supervising Deputy Attorney General, and Robert M. Snider, Deputy Attorney General, for Plaintiff and Respondent.

———————————

Jaqwan Glen Dunbar (Dunbar) appeals his conviction by jury for the murder of Willie Singleton (Singleton) and the attempted murder of Joseph Kelly (Kelly). Dunbar contends that the trial court made the following prejudicial errors: (1) it admitted into evidence of Dunbar's conversation with a jailhouse confidential informant; (2) it restricted his counsel's cross-examination of two police officers; (3) it restricted his counsel's impeachment of Kelly; and (4) it allowed the imposition of a gang enhancement despite the lack of sufficient supporting evidence. In principal part, we disagree with Dunbar, finding that the trial court properly admitted evidence of the jailhouse conversation with the informant and properly limited the cross-examination of the police officers and Kelly. However, we agree with Dunbar that the gang enhancement was not supported by sufficient evidence.

## BACKGROUND

### I.       The Murder of Singleton and the Attempted Murder of Kelly

At approximately 5:40 p.m. on August 4, 2013, Singleton and Kelly were walking southbound down Wilmington Avenue, between 109th and 110th Streets, in Los Angeles. Singleton and Kelly were members of a gang called the Ten Line Gangster Crips (Ten Line Crips or Ten Line). That section of Wilmington Avenue is considered to be part of Ten Line's territory.

As the two men were walking on the sidewalk along the east side of Wilmington Avenue someone called out behind them, "'Fuck Ten Line.'" This statement was followed by a volley of four to five pistol shots. According to an eyewitness, a lone gunman fired at Singleton and Kelly from the west side of Wilmington Avenue near 109th Place. As Singleton and Kelly ran away from the shooter, Singleton was struck by a single bullet. The bullet entered Singleton's right arm, fracturing a bone and damaging a major artery, exited in the area under Singleton's arm and went into the side of his chest before exiting out the front of his chest. The damage to the major artery was fatal. Despite treatment from first responders, Singleton died at the scene.

2

## II. Dunbar's Arrest and Statements to a Jailhouse Confidential Informant

On October 10, 2013, Dunbar was arrested and taken into custody. While being interviewed by detectives, Dunbar was "animated" in denying any involvement in Singleton's murder. In fact, he even told the detectives that he was in another city (Palmdale, California) at the time of the shooting—a statement that was false.

Shortly after midnight on October 11, 2013, following his interview with the investigating detectives, Dunbar was placed in a small holding cell with a confidential informant posing as another prisoner also arrested for murder. The informant was "stocky," approximately five feet eight inches tall, weighing about 180 pounds, wearing civilian clothes and displaying a tattoo associated with another Los Angeles gang, the Rolling 60's. The holding cell was wired for sound-recording and video observation; in addition, the informant was wired for sound and video recording.

Dunbar immediately identified himself to the informant as a gang member, a member of the Bad Ass Gangsta Grips (Bad Ass Crips), who goes by the name of "Fooley" or "Baby Fooley" or "Dice Fooley." Dunbar then recounted how he was with some older "homies" when he wound up shooting a Ten Line Crip with a "burner," a .357-caliber revolver. Dunbar told the informant that he aimed and "busted," or fired, five times from across the street. Dunbar said he was surprised he had hit even one of the two men as he was firing from a distance. When the informant inquired about the gun, Dunbar told him that someone in Louisiana now had the gun. The informant urged Dunbar to claim that he was in Palmdale with his sister at the time of the murder and that he was only trying to enroll in trade school. In response, Dunbar said he had told that false story when interviewed by the detectives and that he would hold to it.

## III. Dunbar's Trial, Conviction and Sentencing

On February 11, 2014, Dunbar pleaded not guilty to one count of murder (Pen. Code,[1] § 187, subd. (a); count 1), one count of attempted murder (§§ 664, 187, subd. (a); count 2), and denied the special allegations with regard to the use of a firearm

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

(§ 12022.53, subds. (b), (c), (d)) and committing a crime for the benefit of criminal street gang (§ 186.22, subd. (b)(1)(C)).

The jury trial began on July 14, 2014. In support of the People's case, the prosecution called several eyewitnesses, the first police officer to arrive at the scene, the officers who later arrested Dunbar and executed a search warrant for the home of Dunbar's mother, a custodian of records for Metro P.C.S. (Dunbar's cell phone service provider), a Los Angeles police detective assigned to the FBI's Cellular Analysis Survey Team and the detective leading the investigation into Singleton's murder, who also testified as an expert on Los Angeles street gangs. The confidential informant did not testify, but the video and audio recordings of the conversation between Dunbar and the confidential informant were admitted into evidence and shown to the jury and a transcript of the audio tape was provided to the jury.

Only one witness testified for the defense: Dunbar. Among other things, Dunbar testified that he lied to the police about being in Palmdale on the day of the shooting because he had never been arrested before and his mother had sent him to Palmdale so that he could stay out of trouble. With regard to his incriminating statements made to the informant, Dunbar testified that he was merely trying to "play a hard role" so that he would not get raped or assaulted. As to the specific facts of Singleton's murder that he related to the informant, he was simply repeating what he had heard about the crime from friends and "[d]udes around the neighborhood," some of whom were also members of the Bad Ass Crips.

On July 23, 2014, after an eight-day trial and less than a day of deliberation, the jury found Dunbar guilty on both counts and also found true the criminal street gang and firearm enhancements.

On September 17, 2014, the trial court sentenced Dunbar to a total term of 50 years to life in state prison. The sentence consisted of 25 years to life on count 1, the principal term, and consecutively, 25 years to life for the firearm enhancement (§ 12022.53, subd. (d)). The gang enhancement was stayed with respect to count 1. Concurrently, the court imposed a total term of 35 years to life as to count 2, consisting

4

of 15 years to life on the attempted murder and an additional 20 years for the firearm enhancement (§ 12022.53, subd. (c)). With regard to the gang enhancement for count 2, the court ordered that Dunbar "serve a minimum of 15 years in state prison before parole may be granted." On that same day, Dunbar filed a timely notice of appeal from the judgment.

## DISCUSSION

### I. The Confrontation Clause was not implicated by the holding cell conversation between Dunbar and the confidential informant

The Confrontation Clause of the Sixth Amendment states that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." (U.S. Const., 6th Amend.) Dunbar claims that the admission into evidence, over his objection, of audiotape, videotape, and transcript of his conversation with the confidential informant violated his Sixth Amendment right to confrontation because the prosecution did not produce the informant as a witness.

The trial court ruled that Dunbar's statements to the informant were admissions and, as such, did not implicate the Confrontation Clause. To the extent that the informant's statements were at issue, the trial court ruled that they did not violate the Confrontation Clause, because they were nontestimonial—that is, the informant's statements were not made in a formal, solemn, structured manner for prosecutorial use. As discussed in more detail below, we find that the trial court did not abuse its discretion in admitting evidence of the holding cell conversation. (*People v. Lawley* (2002) 27 Cal.4th 102, 153.)

*A.    Dunbar's statements to the confidential informant were admissible as admissions against penal interest*

To be admissible, an out-of-court statement must be trustworthy and against the declarant's penal interest. (*People v. Leach* (1975) 15 Cal.3d 419, 441–442.) "Under the rule of *Leach*, a hearsay statement 'which is in part inculpatory and in part exculpatory (e.g., one which admits some complicity but places the major responsibility on others)

5

does not meet the test of trustworthiness and is thus inadmissible.'" (*People v. Duarte* (2000) 24 Cal.4th 603, 612.)

Here, Dunbar's facially incriminating statements implicating himself in the murder of Singleton and the attempted murder of Kelly were in no way exculpatory. Although the conversation was a question and answer session, Dunbar's statements were "inextricably tied to and part of a specific statement against penal interest." (*People v. Samuels* (2005) 36 Cal.4th 96, 121.) Such specificity, including identifying the victims as Ten Line Crips, the type of gun used, and the distance from which Singleton was shot, shows an inherent trustworthiness. The trial court did not err in finding that Dunbar's statements to the confidential informant were admissions against penal interest.

B. *Statements by the confidential informant were nontestimonial and, as such, admissible*

In *Crawford v. Washington* (2004) 541 U.S. 36 [124 S.Ct. 1354, 158 L.Ed.2d 177] (*Crawford*), the United States Supreme Court held that the Sixth Amendment prohibits admission of out-of-court testimonial statements against a criminal defendant unless the declarant is unavailable as a witness and the defendant had a prior opportunity to cross-examine him or her, or the declarant appears at trial. (*People v. Jennings* (2010) 50 Cal.4th 616, 651; *Davis v. Washington* (2006) 547 U.S. 813, 821 [126 S.Ct. 2266, 165 L.Ed.2d 224] (*Davis*).) In other words, only testimonial statements cause the declarant to be a witness within the meaning of the confrontation clause. (*Davis*, at p. 821.) Thus, under *Crawford*, the crucial question is whether an out-of-court statement is testimonial or not. (*People v. D'Arcy* (2010) 48 Cal.4th 257, 290.)

Although the court in *Crawford*, *supra*, 541 U.S. 36 did not explicitly define a "testimonial statement," it set forth three formulations of the "core class of 'testimonial' statements": (1) "'*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially'"; (2) "'extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits,

6

depositions, prior testimony, or confessions'"; and (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" (*Id*. at pp. 51–52 & fn. 3.)  The court distinguished these types of testimonial statements from "a casual remark" made by one acquaintance to another.  (*Id*. at p. 51.)  In other words, an "offhand, overheard remark" is not testimonial.  (*Ibid*.)  This point was subsequently affirmed in *Davis*, *supra*, 547 U.S. 813, where the court observed in dicta that "statements made unwittingly to a [g]overnment informant" or "statements from one prisoner to another" were "clearly nontestimonial."  (*Id*. at p. 825.)

In *People v. Cage* (2007) 40 Cal.4th 965, our Supreme Court used *Crawford*, *supra*, 541 U.S. 36, and *Davis*, *supra*, 547 U.S. 813, to derive certain basic principles to define statements as "testimonial," including the following:  "First, . . . the confrontation clause is concerned solely with hearsay statements that are testimonial, in that they are out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial.  Second, though a statement need not be sworn under oath to be testimonial, it must have occurred under circumstances that imparted, to some degree, the formality and solemnity characteristic of testimony.  Third, the statement must have been given and taken *primarily* for the *purpose* ascribed to testimony—to establish or prove some past fact for possible use in a criminal trial.  Fourth, the primary purpose for which a statement was given and taken is to be determined 'objectively,' considering all the circumstances that might reasonably bear on the intent of the participants in the conversation."  (*Cage*, at p. 984, fns. omitted.)

Here, the conversation between Dunbar and the confidential informant was not a solemn, formal out-of-court analog.  Rather, the relatively brief conversation lasting less than an hour was casual, often profane and it was seemingly made for a variety of purposes wholly unrelated to establishing a fact at trial; in fact, Dunbar implored the older, more worldly-wise informant to "[t]each [him] some shit"—that is, to provide the younger, less experienced Dunbar with advice on how to avoid conviction and incarceration.  Moreover, the conversation between Dunbar and the informant was not

7

conducted under circumstances that would lead an objective participant to reasonably expect that his or her statements might be used in future judicial proceedings. There was, in other words, no structured, self-evident police interrogation.

As a fallback position, Dunbar argues that because the conversation in the holding cell was secretly recorded, the informant's statements were testimonial. This argument is without merit, as illustrated by *People v. Arauz* (2012) 210 Cal.App.4th 1394, 1401–1402, which affirmed the admission of secretly recorded statements by a codefendant to a confidential jailhouse informant. Moreover, a long line of federal cases have held that secretly recording a conversation with a confidential informant does not render that conversation testimonial. For example the Seventh Circuit states: "A statement unwittingly made to a confidential informant and recorded by the government is not 'testimonial' for Confrontation Clause purposes." (*United States v. Watson* (7th Cir. 2008) 525 F.3d 583, 589; see *Brown v. Epps* (5th Cir. 2012) 686 F.3d 281, 287–288 [secretly recorded statements to confidential informant prior to arrest are nontestimonial]; *United States v. Dale* (8th Cir. 2010) 614 F.3d 942, 956 [secretly recorded statements to another prisoner are nontestimonial]; *United States v. Smalls* (10th Cir. 2010) 605 F.3d 765, 778 [secretly recorded statements to confidential informant/inmate was "unquestioningly nontestimonial"].)

## II. Dunbar's right of confrontation was not abridged by limits placed on his cross-examination of two police officers

Dunbar contends that the trial court's refusal to allow him to cross-examine two police officers—Officer James Shannon (Shannon), who arrested Dunbar and executed the search warrant for the home of Dunbar's mother; and Detective Jose Carias (Carias), one of the lead investigators into the murder of Singleton—about prior unrelated events in their careers constituted "prejudicial constitutional error." (Capitalization and boldface omitted.) We disagree.

With regard to Shannon, Dunbar wished to cross-examine him about a civil lawsuit regarding a vehicle crash that involved Crips gang members. The accident, however, did not involve members of Dunbar's gang, the Bad Ass Crips, but another Crip

set, the Rolling 40's, which operated in a different part of the city. Moreover, the accident and resulting lawsuit, which happened approximately 15 years before the Singleton shooting, did not result in any disciplinary action begin taken against Shannon or any other officers or detectives involved in the Singleton shooting investigation. The trial court denied Dunbar's request to impeach Shannon on this issue, ruling that there was an absence of relevance: the subject of the proposed impeachment was "too tenuous and too speculative and it's old. There is nothing that is directly connected to either of the parties in this case."

As for Carias, Dunbar wished to impeach the detective on a fatal shooting in the Imperial Courts housing projects that he was purported involved in and which allegedly led to the detective being barred from reentering the projects. According to Dunbar's counsel, the proposed impeachment might show that Carias has "some kind of motive or grudge against gangs." However, Dunbar was not sure that the "Carias" involved in the Imperial Courts incident was the same person as the detective investigating the Singleton murder. Once again, the trial court denied Dunbar's request on grounds of relevance, finding (based on the prosecution's unchallenged representations) that the Imperial Courts housing project was not near the instant crime scene, the projects' local gang was not affiliated with either of the two gangs involved in Singleton's murder, and that the instant case did not involve Carias using or firing his weapon. Because the proposed impeachment evidence did not implicate Carias's "conduct or investigation of the [instant] case," it was irrelevant. The trial court also found that the proposed impeachment evidence effectively amounted to "character evidence" as it related to Carias.

The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution "to be confronted with the witnesses against him." (U.S. Const., 6th Amend.) Indeed, "'[t]he main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination.*'" (*Davis v. Alaska* (1974) 415 U.S. 308, 315–316 [94 S.Ct. 1105, 39 L.Ed.2d 347].) In particular, the U.S. Supreme Court has "recognized that the exposure of a witness' motivation in testifying is

9

a proper and important function of the constitutionally protected right of cross-examination." (*Id.* at p. 316.) However, it does not follow from this recognition that the Confrontation Clause prevents a trial court from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness. On the contrary, as the U.S. Supreme Court has made clear, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 679 [106 S.Ct. 1431, 89 L.Ed.2d 674].) In other words, "the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." (*Delaware v. Fensterer* (1985) 474 U.S. 15, 20 [106 S.Ct. 292, 88 L.Ed.2d 15].)

The opportunity for cross-examination under California law is limited by relevance, as only relevant evidence is admissible. (Evid. Code, § 350.) To be relevant, evidence must have some "tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) This definition includes evidence "relevant to the credibility of a witness." (*Ibid.*; see Evid. Code, § 780 [the fact finder may consider matters relevant to the truthfulness of the witness's testimony].) Conversely, a matter is "collateral" or irrelevant if it has no logical bearing on any material, disputed issue. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9.) In other words, a fact may bear on the credibility of a witness and still be collateral to the case and therefore inadmissible.

In short, our trial courts have wide latitude to exclude evidence offered for impeachment that is collateral and has no relevance to the pending action. (*People v. Rodriguez*, *supra*, 20 Cal.4th at pp. 9–10.) This exercise of discretion necessarily encompasses a determination that the probative value of such evidence is "substantially outweighed" by its prejudicial, "confusing," or time-consuming nature. (Evid. Code, § 352; see *People v. Lewis* (2001) 26 Cal.4th 334, 374–375 [Evid. Code, § 352 gives trial

10

court broad power to prevent "'"nitpicking"'" over "'"collateral credibility issues"'"].) Also, as long as the excluded evidence would not have produced a "'"significantly different impression"'" of the witness's credibility, the confrontation clause and related constitutional guarantees do not limit the trial court's discretion in this regard. (*People v. Dement* (2011) 53 Cal.4th 1, 52 ["'ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense'"].) As the court explained in *People v. Harris* (2008) 43 Cal.4th 1269, 1292, "'[w]ithin the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance.'"

Here, although the proposed impeachment in each instance was arguably related to the credibility of Shannon and Carias as witnesses, the proposed line of questioning was collateral to the issues in dispute in this case. To borrow from the trial court, the proposed impeachments were simply "too tenuous and too speculative" to be admissible. Because the proposed impeachments were collateral, their admission would have been unduly prejudicial to the prosecution and/or confusing for the jury. Accordingly, the trial court did not abuse its discretion in excluding the proposed impeachments.

## III.  Dunbar was not unduly prejudiced by a limitation placed on his cross-examination of Kelly

Dunbar contends that the trial court committed reversible error when it limited his impeachment of Kelly, who Dunbar maintains was a "critical" prosecution witness because he provided a motive for the crime. Specifically, Dunbar sought to impeach Kelly's veracity with his prior misdemeanor conviction for the theft or unlawful taking or driving of motor vehicle (Veh. Code, § 10851). The trial court allowed Kelly to be impeached with respect to two felony convictions (rape and negligent discharge of a firearm), but disallowed any cross-examination with respect to the misdemeanor Vehicle Code conviction. The trial court justified its decision on the grounds that the vehicle theft-taking conviction was not a crime involving moral turpitude. Dunbar contends that the trial court's reasoning was faulty in that California courts have "uniformly" held that vehicle theft-taking is an offense involving moral turpitude. (See *People v. Lang* (1989)

11

49 Cal.3d 991, 1011.)  As a result, Dunbar claims that a "reversal is required" because "it is reasonably more probable that a more favorable result would have ensued" if he had been allowed to impeach Kelly on the misdemeanor conviction.  We disagree.

First, as a preliminary matter, Kelly was not a witness whose testimony was "critical" to the prosecution's case—either generally or with regard to motivation.  As to the shooting itself, Kelly's testimony was not essential to the prosecution's case as Kelly testified that he did not see the shooter.  With regard to the gang-related motivation for the crime, the key testimony on this issue was provided by other witnesses besides Kelly, including Dunbar himself.  For example, Dunbar identified himself to the jailhouse informant as a member of the Bad Ass Grips and told the informant that he had been arrested for murdering a Ten Line Crip.  In addition, it was Carias, not Kelly, who testified as to the rivalry between Dunbar's relatively new gang, the Bad Ass Grips, and the more established gang to which Singleton belonged, the Ten Line Crips and the increase in status that would inure to Dunbar's gang if a long-time member of Ten Line, such as Singleton, was killed within Ten Line's own territory.

Second, even if Kelly was essential to establishing a gang-related motivation for the shooting, he could not have been cross-examined on the fact of his misdemeanor conviction.  A misdemeanor conviction is "inadmissible *hearsay* when offered as evidence that a witness committed misconduct bearing on credibility." (*People v. Wheeler* (1992) 4 Cal.4th 284, 297.)  Although the facts underlying the misdemeanor conviction might have been used to impeach Kelly, Dunbar never sought to do so.

Third, the fact that the trial court was confused about whether vehicle theft-taking is a crime involving moral turpitude is beside the point.  What matters is whether the trial court abused its discretion in excluding all cross examination about the vehicle theft-taking (both the conviction and the facts underlying that conviction).  A trial court has broad discretion under Evidence Code section 352 to "'exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.'" (*People v. Lewis* (2001) 26 Cal.4th 334,

372, fn. 7.) This discretion gives the trial court broad power to control the presentation of proposed impeachment evidence ""''to prevent criminal trials from degenerating into nitpicking wars of attrition over collateral credibility issues."''" (*Id*. at pp. 374–375.) A trial court's discretion "''must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.)

Here, the trial court did not act in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice—it allowed Kelly to be cross-examined on two felony convictions, while merely excluding a misdemeanor conviction. As our Supreme Court has stated: "In general, a misdemeanor—or any other conduct not amounting to a felony—is a less forceful indicator of immoral character or dishonesty than is a felony. Moreover, impeachment evidence other than felony convictions entails problems of proof, unfair surprise, and moral turpitude evaluation which felony convictions do not present. Hence, courts may and should consider with particular care whether the admission of such evidence might involve undue time, confusion, or prejudice which outweighs its probative value." (*Wheeler*, *supra*, 4 Cal.4th at pp. 296–297.) Evidence of Kelly's misdemeanor conduct—auto theft or joyriding—does not strongly demonstrate moral turpitude, i.e., a "''general willingness to do evil'" (*People v. Castro* (1985) 38 Cal.3d 301, 315), and, accordingly, would not have provided the jury must assistance beyond the two felonies in assessing Kelly's character. Moreover, as we noted above, Kelly was not essential in establishing a gang-related motive for the shooting. As a result, the trial court's decision to exclude Kelly's misdemeanor conviction was both reasoned and reasonable.

## IV. There was insufficient evidence supporting the imposition of a gang enhancement

Dunbar makes two arguments with respect to the imposition of a gang enhancement on his sentence. First, he argues that there was insufficient evidence to show a pattern of gang activity by the members of the Bad Ass Crips. Second, even if

13

there was sufficient evidence of a pattern of gang activity, the prosecution failed to present "solid evidence that the 'primary activities' of the 10 or 15 people who made up the [Bad Ass Crips] comprised the commission of the enumerated offenses." We are unconvinced by Dunbar's arguments with regard to the pattern of gang activity requirement. However, we find Dunbar's arguments regarding the primary activity prong to be persuasive.

### A.     Standard of review

"The law regarding appellate review of claims challenging the sufficiency of the evidence in the context of gang enhancements is the same as that governing review of sufficiency claims generally." (*People v. Leon* (2008) 161 Cal.App.4th 149, 161.) "'In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'" (*People v. Steele* (2002) 27 Cal.4th 1230, 1249.) We presume in support of the judgment the existence of every fact that could reasonably be deduced from the evidence. (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) We may reverse for lack of substantial evidence only if "'upon no hypothesis whatever is there sufficient substantial evidence to support'" the conviction or the enhancement. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

"'[S]ubstantial evidence,'" however, is not synonymous with "any" evidence. Instead, it "'must be of ponderable legal significance. . . . It must be reasonable . . . credible, and of solid value; it must actually be "substantial" proof of the essentials which the law requires in a particular case.'" (*People v. Bassett* (1968) 69 Cal.2d 122, 138–139.) The substantial evidence rule "does not mean we must blindly seize any evidence in support of the respondent in order to affirm the judgment. The Court of Appeal 'was not created . . . merely to echo the determinations of the trial court. A decision supported by a mere scintilla of evidence need not be affirmed on review.'" (*Kuhn v. Department of General Services* (1994) 22 Cal.App.4th 1627, 1633.)

B. *Requirements for imposition of a gang enhancement*

The Street Terrorism Enforcement and Prevention Act, also known as the STEP Act, enacted by the Legislature in 1988. (§ 186.20 et seq.) Underlying the STEP Act was the Legislature's recognition that "California is in a state of crisis which has been caused by violent street gangs whose members threaten, terrorize, and commit a multitude of crimes against the peaceful citizens of their neighborhoods." (§ 186.21.) The act's express purpose was "to seek the eradication of criminal activity by street gangs." (*Ibid.*)

To subject a defendant to the penal consequences of the STEP Act, the prosecution must prove that the crime for which the defendant was convicted had been "committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).) In addition, the prosecution must prove that the gang (1) is an ongoing association of three or more persons with a common name or common identifying sign or symbol; (2) has as one of its primary activities the commission of one or more of the criminal acts enumerated in the statute; and (3) includes members who either individually or collectively have engaged in a "'pattern of criminal gang activity'" by committing, attempting to commit, or soliciting two or more of the enumerated offenses (the so-called "predicate offenses") during the statutorily defined period. (§ 186.22, subds. (e), (f).)

C. *There was sufficient evidence to find a pattern of gang activity*

A "'pattern of criminal gang activity'" is defined as gang members' individual or collective "commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more" enumerated "predicate offenses" during a statutorily defined time period. (§ 186.22, subd. (e); *People v. Gardeley*, 14 Cal.4th 605, 617.) The predicate offenses must have been committed on separate occasions, or by two or more persons. (§ 186.22, subd. (e); *People v. Loeun* (1997) 17 Cal.4th 1, 9–10.) The charged crime may serve as a predicate offense. (*Gardeley*, at p. 625.)

15

Here, the prosecution relied upon the Singleton shooting as one of the predicate offenses and, for the other, evidence that a minor named Dwayne D., a Bad Ass Crip known as "Weezy" and "True Soldier," had a juvenile petition sustained in 2011 for possessing a firearm. Although the prosecution's evidence in support of the "pattern" prong was by no means overwhelming, it met the bare minimum, and, as such, was sufficient. (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1458.)

D.    *There was insufficient evidence to find that the primary activity of Dunbar's gang was criminal in nature*

"The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes be one of the group's 'chief' or 'principal' occupations." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323.) This definition "necessarily exclude[s] the occasional commission of those crimes by the group's members." (*Ibid.*) "'Section 186.22 . . . requires that one of the primary activities of the group or association itself be the commission of [specified] crime[s]. . . .'" (*Sengpadychith*, at p. 324.) Consequently, "[s]ufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute." (*Ibid.*)

In order to establish a gang's primary activities, expert testimony is often used. Where such testimony has a reliable foundation, it is sufficient to establish a gang's primary activities. For example, in *People v. Gardeley*, *supra*, 14 Cal.4th 605, the testimony supporting a gang enhancement was provided by a detective who not only had extensive experience with gangs, gang members, and gang-related crimes generally, but also knew the defendants, and had had conversations with them and with other members of the gang prior to the commission of the crime at issue. (*Id*. at p. 620.) The court found that this was a sufficient evidentiary foundation. (*Ibid.*) Similarly, in *People v. Martinez* (2008) 158 Cal.App.4th 1324, a gang expert from Los Angeles County Sheriff's Department was able to provide sufficient evidence for a gang enhancement finding, because he had dealt with the gang for "eight years . . . including investigations and personal conversations with members," among other things. (*Id*. at p. 1330.) In *In re*

16

*I. M*. (2005) 125 Cal.App.4th 1195, 1207–1208, the prosecution's gang expert properly relied on a combination of his personal knowledge of the defendant and on a series of police reports.

However, where a reliable foundation is lacking, then that expert testimony is insufficient to establish a gang enhancement. For example, in *In re Nathaniel C*. (1991) 228 Cal.App.3d 990, the court found that the expert evidence offered by a police officer to establish a gang enhancement was insufficient, because the expert was merely repeating what other officers had told him: "Such vague, secondhand testimony cannot constitute substantial evidence that the required predicate offense by a gang member occurred." (*Id*. at p. 1003.) Similarly in *In re Leland D*. (1990) 223 Cal.App.3d 251, the court held that the expert testimony was insufficient to prove a gang enhancement because the expert did not provide any details of the crimes he attributed to the gang and based his opinion solely on "hearsay statements from unidentified gang members and information pertaining to arrests of purported gang members . . . ." (*Id*. at p. 259.) The expert's testimony was the only evidence offered to prove the gang enhancement, and the evidence did not specify "[e]xactly who, when, where and under what circumstances" the gang's crimes were committed. (*Id*. at pp. 259–260.) Because this testimony provided no more than conclusory and general pronouncements about the gang's primary purpose of committing gang crimes, the appellate court found the expert's testimony insufficient as a matter of law to prove the gang enhancement. (*Ibid*.)

When the foundation for the gang expert's opinion is unclear, then imposition of a gang enhancement is inappropriate. (*In re Alexander L*. (2007) 149 Cal.App.4th 605, 612.) In *Alexander L*., the gang expert was asked about the gang's primary activities and he simply responded that he knew the gang had been involved in murders, auto thefts, auto/vehicle burglaries, felony graffiti, and narcotic violations. (*Id*. at p. 611.) However, at no time did the expert explain what information he relied on in forming his opinion. (*Id*. at p. 612.) Because the testimony lacked proper foundation, the court in *Alexander L*. held that the expert's conclusory testimony could not constitute substantial evidence as to the gang's primary activities. (*Ibid*.)

Here, the prosecution's evidence regarding the "primary activity" of Dunbar's gang, the Bad Ass Crips, was provided by Carias, the lead detective investigating the shooting, who also testified as an expert on Los Angeles street gangs. Carias's experience with street gangs was extensive. He had been a prison guard who had interacted with gang members for four years. Later, on the police force, he served as an enforcement officer in gang-occupied housing projects, as a gang officer assigned to monitor the Project Watts Crips and, significantly, Ten Line Crips exclusively, as a member of a federal gang task force, and as a gang homicide investigator. By the time of trial, Carias had attended two law enforcement "gang schools," written and served numerous gang warrants, made contact with hundreds of gang members, and testified as a gang expert about two dozen times.

According to Carias, the primary activities of the Bad Ass Crips were "burglaries, possession of loaded weapons, shootings and murder." The basis for Carias's opinion was his long experience with gangs generally. Because the Bad Ass Crips were a new and relatively small gang, Carias had only known about them since 2012. Although Carias did not have a long history of investigating the Bad Ass Crips directly, he had a long history of dealing with their principal rival, the Ten Line Crips. In fact, Carias testified that he had talked to Singleton, a longtime member of the Ten Line Crips, on "numerous occasions." Through the two gangs' rivalry, Carias was familiar with the territory claimed by the Bad Ass Crips, their member count, and their identifying signs and graffiti.

Carias, however, did not explain how he knew that the primary activities of the Bad Ass Crips were burglaries, possession of loaded weapons, shootings and murder. Other than the lone juvenile petition for possessing a firearm and the instant crime, no other evidence was offered establishing that possession of loaded guns was a primary activity of the 10 to15 members of the Bad Ass Crips. Similarly, other than the Singleton murder, there was no evidence offered that killings or even shootings was an activity that the Bad Ass Crips engaged in on consistent and repeated basis. And no evidence whatsoever was offered establishing that burglary was a primary activity of Dunbar's

18

gang. Furthermore, no testimony was offered establishing that Carias had spoken with any member of the Bad Ass Crips on any occasion prior to the Singleton shooting. Not surprisingly, Carias did not provide any testimony about the organization and leadership structure of the Bad Ass Crips.

In sum, Carias's testimony about the primary activities of the Bad Ass Crips was not of ponderable legal significance. He provided no foundational specificity as to by whom, when, where and under what circumstances the gang's purported crimes were committed. In a word, Carias's testimony on this issue was conclusory. Because there was an inadequate foundation for Carias's opinion about the primary activities of the Bad Ass Crips, the gang enhancement findings are reversed.

## DISPOSITION

The street gang enhancements are reversed. Because the abstract of judgment fails to indicate that the sentence for attempted murder was to run concurrently with the sentence for murder, we direct the trial court to correct the abstract to reflect the trial court's pronouncement and forward the amended abstract of judgment to the California Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


ROTHSCHILD, P. J.


LUI, J.

19