**Opinion filed July 30, 2021**



## In The

# Eleventh Court of Appeals

_____

## No. 11-18-00267-CR

_____

## BOBBY RAY RUIZ, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 106th District Court**

**Gaines County, Texas**

**Trial Court Cause No. 14-4492**

### O P I N I O N

The State charged Appellant, Bobby Ray Ruiz, with two counts of capital murder for causing the deaths of John Allen and Jay Doyal during the commission of a robbery. *See* TEX. PENAL CODE ANN. §§ 19.02(b)(1) (West 2019), 19.03(a)(2) (West Supp. 2020). The jury found him guilty on both counts. Because the State did not seek the death penalty, the trial court sentenced Appellant to life imprisonment without parole for each count. *See* PENAL § 12.31(a)(2); TEX. CODE

CRIM. PROC. ANN. art. 37.071, § 1 (West Supp. 2020). Appellant now raises thirteen issues on appeal. We affirm.

## I. *Factual Background*

This case originated in 2011 in Hobbs, New Mexico, at the house that Linda Taber inherited when her parents passed away. Taber and her daughter, Lori Craig, lived at the house with Taber's aunt, who had inherited some diamond rings from Taber's mother, Estella Collum. Trent Ashlock was a friend of Craig's and an addict; he also temporarily resided at the house as Craig's clandestine guest. Before Taber's aunt passed away, Ashlock found a bag in one of the bathrooms at the house; the bag contained three diamond rings. Ashlock took the rings and went to Rolando "Rollie" Cantu's house in Hobbs, where Ashlock attempted to trade them for methamphetamine. Instead, Cantu kept the rings, and Ashlock never received any drugs in exchange for them.

Cantu initially gave one of the three diamond rings to his girlfriend, and the mother of his son, Desirae Mata. At some point, Cantu took the ring back from Mata and brought the three rings that he obtained from Ashlock to Allen's house near Seminole, Texas. Joanie Pannell, a resident of Hobbs, lived with Allen at the time, and Cantu showed Pannell and Allen the diamond rings to determine whether Ashlock had taken them from Allen's house or whether the rings belonged to Pannell. In Cantu's presence, Pannell said that the rings were hers, but she later told Allen, after Cantu had left, that they were not. Ultimately, Cantu left the rings with Allen, who agreed to fence them for Cantu. Pannell also told Allen that he should get rid of the rings right away and suggested that he try to fence them in New York City.

In December of 2011, Allen flew to New York City with another individual, Nathan Webster, to sell the rings there. While they were in New York City, Allen sold the three rings for $73,000. Allen spent some of the proceeds from the sale on

2

a 2004 Maserati. Allen and Webster drove home to Texas in the Maserati. Later, Allen and Webster split the rest of the money from the sale of the diamond rings.

In the meantime, Cantu was sentenced to a term of imprisonment, and Mata moved in with Allen in January of 2012 after Allen returned from New York City. Mata knew that Allen had sold the diamond rings in New York City, and Allen told her that he had received $60,000 for them. Mata was angry because Allen had sold "[her] diamond." Cantu wrote to Allen from prison about some money that Allen was to give to Mata; however, Mata never received any money from Allen. Mata's romantic involvement with Allen ended in April of 2012.

Around that time, Allen and Webster installed a four-camera security system at Allen's house. Allen had become paranoid because someone had attempted to break into his house once while he was out of town; Allen later told Webster that he suspected that Appellant was the one who tried to break in. Allen had also indicated to Pannell that his cousin had presented a job opportunity for Allen in Oklahoma, and others later noticed that Allen's house was packed up as though he intended to move.

On May 9, 2012, the day before Allen and Doyal were murdered, Mata and Cantu spoke on the phone. Mata testified that, during their phone conversation, Mata told Cantu: "That was my diamond. My diamond. F--k that. I don't give a damn about the money. That was my diamond. . . . F--k him. That was bulls--t. People die over diamonds. I don't give a damn." To agitate Cantu, Mata then claimed that Allen had been paid $90,000 for the diamond rings that were sold in New York City, and she repeatedly called Cantu a "fool" for trusting Allen. Mata told Cantu that Allen was getting ready to move to Oklahoma, so she would never see any of the money that she was due from him. Mata also mentioned to Cantu that Appellant, who had been shot on May 2, 2012 during an unrelated event, was no longer in the hospital.

3

On May 10, 2012, Texas Ranger Brian Burney received a phone call from Gaines County Sheriff Jon Key about a double homicide in Seminole. Apparently, Allen and Doyal had been shot and killed at Allen's house. Allen's body was found in a child's bedroom toward the back of the house, and Doyal's body was found in the living room. Doyal had been shot in the head and chest, and a cigarette lighter and a methamphetamine pipe were found in one of his hands. Autopsies were performed and revealed that both men had methamphetamine in their systems at the time of their deaths. A red cigarette lighter was also found on the living room windowsill. DNA was extracted from the red lighter, and the DNA test results could not exclude Appellant as a possible contributor to the DNA profile, which was determined to be a mixture of four individuals. However, the tested DNA sample did exclude Allen and Doyal as possible contributors.

Detective Rodney Porter worked in the Crimes Investigation Division at the Hobbs Police Department at the time these events occurred. From May to August of 2012, Detective Porter assisted Sheriff Key and Ranger Burney in the investigation of the Allen and Doyal murders. Detective Porter learned that Sheriff Key and Ranger Burney were searching for four individuals in connection with the murder investigation: Desirae Mata,[1] Juan Castillo,[2] Nicomedes Sosa,[3] and Appellant.

---

[1] In 2015, Mata was convicted of two counts of capital murder for the deaths of Allen and Doyal. Mata appealed her convictions to this court, and we affirmed. *See Mata v. State*, No. 11-15-00081-CR, 2017 WL 2986845, at *1 (Tex. App.—Eastland July 13, 2017, pet. ref'd) (mem. op., not designated for publication).

[2] Juan Castillo goes by the nicknames "Smoke," "$moke," "Smokey," and, sometimes, "Smoke Dawg." He was also convicted of capital murder in 2015 for the deaths of Allen and Doyal. Like Mata, he appealed his convictions to this court, and we affirmed. *See Castillo v. State*, No. 11-15-00168-CR, 2017 WL 3089839, at *1 (Tex. App.—Eastland July 20, 2017, no pet.) (mem. op., not designated for publication).

[3] Sosa goes by the nickname "Dan Dan." In 2017, he pleaded guilty to two counts of first-degree murder for the deaths of Allen and Doyal and was sentenced to imprisonment for thirty-three years on each count, to run concurrently.

A. *Desirae Mata*

Mata was friends with Sosa and Appellant, whom she had known since she was fifteen or sixteen years old. Two months after Allen and Doyal were murdered, Mata went to Alabama, where she was subsequently arrested in Shelby County. While she was there, she was confined in the Shelby County jail in the same cell block as Angie Brown. According to Brown, Mata spoke extensively to her about the murders of Allen and Doyal when Mata would visit Brown in her cell. Because Brown often wrote letters while she was in her cell, Mata was unaware that Brown was taking notes as Mata told her details about the murders. As Mata told Brown about the murders of Allen and Doyal, Mata mentioned the names "Smoke [Juan Castillo], Bobby [Appellant] and Dan Dan [Sosa]." Brown testified that because Allen owed Mata's "baby daddy [Cantu] some money," Mata and the others went to Allen's house to collect the money so that Mata could later deposit the money into Cantu's prison account. Mata also told Brown that Doyal "was an innocent bystander that got shot," that Allen and Doyal were shot in the head, that Sosa was the shooter, and that Juan[4] had removed the surveillance equipment from Allen's house.

Additionally, Mata told Brown that she and Appellant attempted to break into Allen's house two weeks before Allen and Doyal were murdered so that Appellant could return some guns that they had stolen. Mata expressed concern that the surveillance footage from Allen's house would show that she had shut off the power to the house during the attempted break-in. Brown further testified that Appellant "ran over some girl" named Abigail while Mata was with him in Hobbs but that Appellant "beat it because it was accidentally [sic] or something."

---

[4]Because several individuals involved in this case have the same surname, we will refer to those individuals by their first name for purposes of clarity.

When Mata testified at Appellant's trial, she denied involvement in, and conversing with Brown about, the murders of Allen and Doyal.

B. *Juan Castillo*

A week after Allen and Doyal were murdered, Juan appeared at David Delapaz's house and said that "he had to get something off his chest." Juan told Delapaz that he, Mata, Sosa, and Appellant drove to Allen's house in Juan's car. When they arrived, the three men waited on the side of Allen's house while Mata knocked on the front door. They all rushed into the house as soon as Allen opened the front door. Because Allen apparently refused to give them his safe, Sosa began pistol-whipping Allen until he fell to the ground; Appellant then shot Doyal twice in the chest. Allen got up and ran from the room; Sosa followed and "gunned him down" near a hallway in the house. Juan, Mata, Sosa, and Appellant then "moved the bodies around" and placed a pipe in one of the victim's hands to "make it look like it was a drug deal gone bad."

Detective Porter had known Juan and his brother, Roque Castillo, for several years prior to the inception of this investigation. Because Roque was in the city jail in Hobbs at the time, Detective Porter asked Roque for information as to his brother's (Juan's) whereabouts. According to Detective Porter, Roque knew certain critical details about the murders of Allen and Doyal that his brother Juan had told him; namely, who drove, which car was used, and who went inside Allen's house. Detective Porter ultimately located and arrested Juan on an outstanding Texas arrest warrant that was unrelated to the Allen and Doyal murders.

Detective Porter later interviewed Juan at the Hobbs Police Department. Juan stated that he, Sosa, Appellant, and "Dez," whom he clarified to be someone named Desirae Reyna,[5] went to Allen's house in a black car. Appellant and Sosa were the

[5]Detective Porter testified that he determined that Desirae Reyna was, in fact, incarcerated at the time of the Allen and Doyal murders.

6

aggressors of the group and the ones who possessed guns. According to Juan, Appellant shot Doyal at the front door just as Allen opened it, and Sosa shot and killed Allen in or near one of the bedrooms in the house. The four of them then attempted to open Allen's safe, but were unable to do so. Juan claimed that Appellant staged one of the bodies by leaving a pipe in one of the hands of that victim. He further claimed that he could lead Detective Porter to the missing surveillance equipment, some burned clothing, and the guns that were used in the murders; however, none of these items were located.

Pannell testified about an encounter that she had with Juan that occurred after Allen and Doyal had been murdered but prior to her interview with Ranger Burney. Evidently, Pannell had been arrested for outstanding traffic tickets and was in a transport van that was traveling from the city jail in Hobbs to the Lea County jail. Juan was also in the van at the time, and he asked Pannell if she remembered him. When Pannell said that she knew Allen, Juan told her that "it was a good lick."

Juan testified at Appellant's trial and denied having any involvement in the murders. According to Juan, because he was not involved, he never told Delapaz anything about what had occurred at Allen's house. Juan further testified that the confession he provided to Detective Porter during the interview was coerced and that he was not present at Allen's house when Allen and Doyal were murdered.

C. *Nicomedes Sosa*

The State called Sosa as a witness at Appellant's trial. Sosa testified that he alone shot and killed Allen and Doyal; that he went to Allen's house that day with another individual, whom he refused to name; and that Mata, Appellant, and Juan were neither present at Allen's house that day nor involved in the murders. According to Sosa, after he shot Allen and Doyal, he left the bodies in the house but returned later to remove the surveillance console from Allen's house.

7

D. *Appellant*

When he was interviewed by Detective Porter, Appellant denied any involvement in the murders of Allen and Doyal. Appellant also told Detective Porter that he had been shot on May 2, 2012, and claimed that, at the time the murders were committed, he was at home on bed rest. Appellant did not testify at trial.

## II. *Sufficiency of the Evidence*

In his first issue, Appellant challenges the sufficiency of the evidence to support his convictions.

### A. *Standard of Review*

We review a challenge to the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

When conducting a sufficiency review, we consider all of the evidence admitted at trial, including evidence that may have been improperly admitted. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *Brooks*, 323 S.W.3d at 899. This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Clayton*, 235 S.W.3d at 778. We may not reevaluate the weight and credibility of the evidence to substitute our judgment for that of the factfinder. *Dewberry v. State*,

4 S.W.3d 735, 740 (Tex. Crim. App. 1999). Therefore, if the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Merritt v. State*, 368 S.W.3d 516, 525–26 (Tex. Crim. App. 2012); *Clayton*, 235 S.W.3d at 778.

Further, we treat direct and circumstantial evidence equally under this standard. *Isassi*, 330 S.W.3d at 638; *Clayton*, 235 S.W.3d at 778; *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). It is not necessary that the evidence directly prove the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt, and circumstantial evidence can alone be sufficient to establish guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper*, 214 S.W.3d at 13). Therefore, in evaluating the sufficiency of the evidence, we must consider the cumulative force of all the evidence. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017); *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015). Each fact need not point directly and independently to guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction. *Hooper*, 214 S.W.3d at 13.

Finally, we measure the sufficiency of the evidence by the elements of the offense as defined by the hypothetically correct jury charge for the case. *Morgan v. State*, 501 S.W.3d 84, 89 (Tex. Crim. App. 2016); *see also Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Malik*, 953 S.W.2d at 240.

Appellant contends that the evidence is insufficient to support his convictions for capital murder because the State failed to prove all of the statutory elements of

the charged offenses beyond a reasonable doubt.  Specifically, Appellant argues that the record contains "absolutely no substantive evidence" that he either committed the murders of Allen and Doyal as the principal actor or that he was criminally responsible as a party to these murders.  We cannot agree.

B. *Analysis*

As charged in this case, a person commits the offense of capital murder if he intentionally or knowingly causes the death of an individual in the course of committing or attempting to commit robbery.  PENAL §§ 19.02(b)(1), 19.03(a)(2).  A person commits the offense of robbery if, in the course of unlawfully appropriating property with the intent to deprive the owner of property, and with the intent to obtain or maintain control of the property, he intentionally, knowingly, or recklessly causes bodily injury to another.  *Id.* §§ 29.02(a)(2), 31.03(a)-(b)(1).  Under the law of parties, a person is criminally responsible as a party to an offense if the offense is committed by his own conduct, by the conduct of another for which he is criminally responsible, or by both.  *Id.* § 7.01(a) (West 2021).  A person is criminally responsible for an offense committed by the conduct of another if, acting with the intent to promote or to assist in the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. *Id.* § 7.02(a)(2).

At trial, the State adduced sufficient evidence to support the jury's verdicts that Appellant committed capital murder as charged in the indictment.  The jury heard testimony from multiple witnesses that Appellant went to Allen's house with Mata, Sosa, and Juan and that they, including Appellant, intended to rob Allen because Mata wanted the money that had been promised to her by Cantu.  Juan made statements to Detective Porter and Delapaz that identified Appellant as one of the shooters and the person who murdered Doyal.  Prior to the murders, Mata and Appellant had been seen by others at Allen's house on occasion.  Evidence was

10

presented that Cantu and Appellant were members of the "most hated" gang, which showed the association between Appellant and Cantu and the former's motive or intent to participate and assist in the commission of the robbery that led to the murders of Allen and Doyal. Further, the DNA evidence could not exclude Appellant as a contributor to the red lighter that was found at Allen's house.

The jury is authorized to believe all, some, or none of any witness's testimony. *Adelman v. State*, 828 S.W.2d 418, 421 (Tex. Crim. App. 1992); *Reyes v. State*, 465 S.W.3d 801, 805 (Tex. App.—Eastland 2015, pet. ref'd) (citing *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986)); *see Winfrey*, 393 S.W.3d at 768; *Brooks*, 323 S.W.3d at 899. Although Mata and Juan maintained that they were not involved in the murders of Allen and Doyal, and Sosa testified that he alone committed these murders, it is the jury's duty to resolve conflicts in the testimony, to weigh the evidence, to assess witness credibility, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 326; *Merritt*, 368 S.W.3d at 525–26; *Clayton*, 235 S.W.3d at 778. It is not our role or function to engage in or make credibility determinations. *See Jackson*, 443 U.S. at 326; *Winfrey*, 393 S.W.3d at 768; *Brooks*, 323 S.W.3d 899; *Clayton*, 235 S.W.3d at 778. As such, when the evidence in the record supports conflicting inferences, we presume that the jury resolved any conflicting inferences in favor of the verdicts, and we defer to the jury's determinations. *See Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 899; *Clayton*, 235 S.W.3d at 778.

We have reviewed the evidence in the light most favorable to the jury's verdicts, and we hold that the record before us contains sufficient evidence from which a rational jury could have logically inferred and found beyond a reasonable doubt that Appellant was guilty of both counts of capital murder for the deaths of Allen and Doyal as charged in the indictment. Therefore, because the jury could have found the elements of the charged offenses beyond a reasonable doubt, we hold

that the evidence is sufficient to support Appellant's convictions.  Accordingly, we overrule Appellant's first issue.

### III.  *Accomplice and Jailhouse-Informant Testimony*

In his second issue, Appellant asserts that the State failed to meet its statutory burden for the corroboration of "accomplice-witness" testimony and "jailhouse-informant" testimony under Articles 38.14 and 38.075, respectively, of the Texas Code of Criminal Procedure.  *See* CRIM. PROC. art. 38.14 (West 2015), art. 38.075 (West Supp. 2020).

### A.  *Standard of Review*

When we conduct a sufficiency review under either the "accomplice-witness" rule or the "jailhouse-informant" rule, we must eliminate from consideration the accomplice-witness's or jailhouse-informant's testimony and then examine the remaining portions of the record to determine if there is any evidence that *tends to connect* the accused with the commission of the charged offense.  *Smith v. State*, 332 S.W.3d 425, 442 (Tex. Crim. App. 2011); *Cook v. State*, 858 S.W.2d 467, 470 (Tex. Crim. App. 1993); *Schnidt v. State*, 357 S.W.3d 845, 851 (Tex. App.—Eastland 2012, pet. ref'd).

Here, Appellant specifically argues that neither "accomplice-witness" *testimony* nor "jailhouse-informant" *testimony* can be used to corroborate the other.  However, for the reasons discussed below, we need not address the merits of Appellant's argument on appeal.

### B.  *Analysis*

Article 38.14 provides that "[a] conviction cannot be had upon the *testimony* of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense."  CRIM. PROC. art. 38.14 (emphasis added).  Article 38.075, which governs jailhouse statements or confessions that are

made by a defendant to another inmate, similarly provides in relevant part:

> A defendant may not be convicted of an offense on the *testimony* of a person *to whom the defendant made a statement* against the defendant's interest *during a time when the person was imprisoned or confined in the same correctional facility as the defendant* unless the *testimony* is corroborated by other evidence tending to connect the defendant with the offense committed. In this subsection, "correctional facility" has the meaning assigned by Section 1.07, Penal Code.

CRIM. PROC. art. 38.075(a) (emphasis added).

In this case, the trial court's charge contained a general instruction as to the corroboration requirement for any "accomplice-witness" testimony. The charge also included an instruction on "jailhouse-informant" corroboration that was specific to the testimony of Brown.

In their briefs, both Appellant and the State advance their arguments on the premise that the Article 38.14 "accomplice-witness" at issue is Juan Castillo and that the Article 38.075 "jailhouse-informant" in this case is Angie Brown. However, the parties disagree as to whether the *testimony* of either witness should be allowed to corroborate the testimony of the other under the statutes cited above. *See* CRIM. PROC. arts. 38.14, 38.075. The State maintains that "[n]othing in the plain language of either [A]rticle 38.075 or 38.14 prohibits accomplice witnesses and jailhouse informants from corroborating each other." However, based on the plain and relevant language of both statutes, it is clear that neither Article 38.14 nor Article 38.075 is applicable here.

Although Juan is an "accomplice witness" under Article 38.14, the content of Juan's trial *testimony* is not the focus of Appellant's point on appeal. Rather, Appellant's corroboration contention targets *statements* that were made by Juan and that were offered at trial by the State through the testimony of Delapaz, Pannell, and Detective Porter. Indeed, throughout his briefing on this issue, Appellant consistently refers to Juan's "statements"—not his testimony—in connection with

13

his asserted application of the "accomplice-witness" rule. Nevertheless, because Article 38.14 only addresses and applies to "accomplice-witness" *testimony*, and not *statements*, any past statements that were made by Juan and that were elicited through the testimony of those to whom the statements were made do not fall within the purview of Article 38.14. *See Bingham v. State*, 913 S.W.2d 208, 213 (Tex. Crim. App. 1995).

In connection with the parties' reliance on the application of the "jailhouse-informant" rule, such reliance is misplaced. Here, Appellant's briefing repeatedly refers to Brown's "testimony," which consisted of the statements that Mata, an accomplice to the murders of Allen and Doyal, had made to Brown when they were confined together in the Shelby County jail. However, in this case, Brown cannot, under any scenario, be characterized as a "jailhouse-informant" pursuant to Article 38.075. Here, to have invoked the provisions of Article 38.075, the following events must have transpired: (1) *Appellant and Brown* must have been confined together in the same correctional facility; and (2) Appellant must have made a statement or statements against his interest directly to *Brown* during their contemporaneous confinement in the same correctional facility. *See Phillips v. State*, 463 S.W.3d 59, 67–68 (Tex. Crim. App. 2015). In this case, neither condition occurred. In fact, the record before us is devoid of any communications or statements that were made, at any time, by Appellant to Brown. Furthermore, there is no evidence that Appellant and Brown were ever contemporaneously confined, at any time, in the same correctional facility. *See* CRIM. PROC. art. 38.075(a). Brown testified that past statements were made to her by *Mata* while she and *Mata* were both confined together in the county jail in Shelby County, Alabama; this is undisputed. *See* PENAL § 1.07(a)(14)(A) ("Correctional facility" includes a county jail.). Therefore, as relevant to Appellant's case, Mata's status as an accomplice to the murders of

14

Allen and Doyal does not, and cannot, transform Brown into a "jailhouse-informant" under Article 38.075.[6]

Because neither "accomplice-witness" nor "jailhouse-informant" testimony exists in this instance, neither corroboration provision under the controlling statutes is applicable. Therefore, we need not decide the question of whether one may corroborate the other under Articles 38.14 and 38.075. Accordingly, we overrule Appellant's second issue on appeal.

## IV. *Jury Charge*

In Appellant's third and fourth issues, he asserts jury charge error with respect to "accomplice-witness" and "jailhouse-informant" testimony and the law-of-parties doctrine.

### A. *Standard of Review*

We review alleged jury charge error by considering: (1) whether error existed in the charge and (2) if actual error is present, whether sufficient harm resulted from the error to compel reversal. *Phillips v. State*, 463 S.W.3d 59, 64–65 (Tex. Crim. App. 2015); *Leza v. State*, 351 S.W.3d 344, 355–56 n.45 (Tex. Crim. App. 2011) (citing *Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005)); *Hardeman v. State*, 556 S.W.3d 916, 923 (Tex. App.—Eastland 2018, pet. ref'd). If no error occurred, our analysis ends. *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). However, if we find error, we conduct a harm analysis. *Cortez v. State*, 469 S.W.3d 593, 598 (Tex. Crim. App. 2015); *Phillips*, 463 S.W.3d at 65; *Kirsch*, 357 S.W.3d at 649. If the error was preserved by a timely objection to the charge, we will reverse if the error caused some harm to the appellant. *Ngo*, 175 S.W.3d at 743–44. Conversely, if the error was not preserved, we will reverse only if the record demonstrates that the error, if any, caused egregious harm to the appellant. *Id.*

---

[6]In Mata's trial for the murders of Allen and Doyal, Brown was properly designated as a "jailhouse-informant" against Mata. *See Mata*, 2017 WL 2986845, at *2.

15

B. *Corroboration Instruction*

In his third issue, Appellant argues that the trial court erred when it failed to instruct the jury that neither an "accomplice-witness" nor a "jailhouse-informant" could corroborate the testimony of the other. Because we have concluded that neither statute is applicable to the witnesses who testified at Appellant's trial or to the circumstances in this case, we hold that the trial court did not err when it refused to instruct the jury in the manner requested by Appellant. Accordingly, we overrule Appellant's third issue on appeal.

C. *Law-of-Parties Instruction*

In his fourth issue, Appellant argues that the trial court erred when it submitted a law-of-parties instruction in the charge because the evidence adduced at trial did not support a jury verdict under that doctrine. We disagree.

If it is supported by the evidence and can legally apply to the offense at issue, liability as a party is an available legal theory that the State is entitled to have submitted to the jury in the trial court's charge. *In re State ex rel. Weeks*, 391 S.W.3d 117, 124 (Tex. Crim. App. 2013) (citing *Marable v. State*, 85 S.W.3d 287, 287–88 & n.3 (Tex. Crim. App. 2002)); *see* CRIM. PROC. art. 36.14 (West 2007). Further, the trial court's submission of a law-of-parties instruction is harmless if the evidence supports a defendant's guilt as a principal actor. *Ladd v. State*, 3 S.W.3d 547, 564–65 (Tex. Crim. App. 1999); *Black v. State*, 723 S.W.2d 674, 675 (Tex. Crim. App. 1986).

Appellant's argument that the trial court erred when it submitted a party-liability instruction essentially reasserts his prior complaints regarding the sufficiency of the evidence to support his convictions and the corroboration dispute. Appellant maintains that the only evidence that links or tends to connect him to the charged offenses consisted of the statements of Juan and Mata and that this evidence could not support the jury's finding of his guilt as the principal actor. Here, the

record before us does not indicate, and we will never know, whether the jury found Appellant guilty of the charged offenses as a party or as the principal actor. Nevertheless, we have already held, consistent with the applicable standard of review, that the evidence adduced at trial is sufficient to support Appellant's capital murder convictions, on both counts, as either the principal actor or as a party to the offenses. Therefore, we hold that the trial court did not err when it submitted a law-of-parties instruction to the jury. Accordingly, we overrule Appellant's fourth issue on appeal.

## V. *Excluded Evidence*

We next consider two issues raised by Appellant (his fifth and seventh issues) that relate to the trial court's exclusion of certain evidence of which Appellant was the proponent.

### A. *Standard of Review*

We review a trial court's decision to exclude evidence under an abuse of discretion standard. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019); *Coble v. State*, 330 S.W.3d 253, 272 (Tex. Crim. App. 2010); *Cameron v. State*, 241 S.W.3d 15, 19 (Tex. Crim. App. 2007) (citing *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991)); *Kelly v. State*, 824 S.W.2d 568, 574 & n.14 (Tex. Crim. App. 1992); *Walter v. State*, 581 S.W.3d 957, 977 (Tex. App.—Eastland 2019, pet. ref'd). We will not reverse a trial court's decision to exclude evidence, and there is no abuse of discretion, unless that decision lies outside the zone of reasonable disagreement. *Beham v. State*, 559 S.W.3d 474, 478 (Tex. Crim. App. 2018); *De La Paz v. State*, 279 S.W.3d 336, 343–44 (Tex. Crim. App. 2009); *Cameron*, 241 S.W.3d at 19; *Walter*, 581 S.W.3d at 977. Furthermore, we will not disturb a trial court's evidentiary ruling, even if the trial court's reasoning was flawed, if it is correct on any theory of law that reasonably finds support in the record and is applicable to the case. *Henley v. State*, 493 S.W.3d 77, 93 (Tex. Crim. App.

2016); *De La Paz*, 279 S.W.3d at 344; *Gonzalez v. State*, 195 S.W.3d 114, 125–26 (Tex. Crim. App. 2006); *Dering v. State*, 465 S.W.3d 668, 670 (Tex. App.—Eastland 2015, no pet.).

B. *Testimony of Dr. Charles Keenan*

In his fifth issue, Appellant argues that the trial court erred when it excluded the testimony of Dr. Charles Keenan, a witness offered by Appellant at trial. Appellant asserts that this error infringed on his constitutional right to present a defense. We cannot agree.

Charles Keenan, Ph.D., was retained by Appellant and his trial counsel as an expert to testify in the field of false or coerced confessions and to evaluate whether Juan's confession to Detective Porter was made freely and voluntarily. In assessing the voluntariness of Juan's confession, Dr. Keenan reviewed discovery documents that he had been provided, which included video and audio recordings of the interviews and transcripts of Juan's prior testimony from the trials of the other accomplices who were charged with the murders of Allen and Doyal. In this case, Appellant represents that Dr. Keenan intended to opine that Juan's confession to Detective Porter "was a coerced compliant false confession."

Under Rule 702 of the Texas Rules of Evidence, an expert witness may testify "if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." TEX. R. EVID. 702. Whether expert testimony will help the jury understand the evidence or determine a disputed fact and, thus, whether the expert's testimony is admissible are threshold determinations to be made by the trial court. *Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006); *Rodgers v. State*, 205 S.W.3d 525, 527 (Tex. Crim. App. 2006); *Kelly*, 824 S.W.2d at 572. Here, having reviewed Appellant's proffer, we cannot say that Dr. Keenan's proposed testimony concerning the voluntariness of

Juan's confession would have helped the jury to understand the evidence in Appellant's trial.

Although Dr. Keenan's proffered testimony may have been helpful to the jury if Juan had been the trial defendant in this case, we cannot agree with Appellant's assertion that the presentation of "expert" testimony on the voluntariness of Juan's confession would have aided the jury in its determination of Appellant's guilt. Juan testified that he lied to Detective Porter during the interview, that he had "slammed" heroin just before he was arrested, and that he only concocted an elaborate story about what had occurred at Allen's house so that Detective Porter would release him. Appellant asserts that Dr. Keenan's testimony, if admitted, "would have given the jury a template against which to judge Juan Castillo's claim" that he lied to Detective Porter; however, the jury was able to view Juan's recorded interview with Detective Porter and observe his demeanor. Moreover, Dr. Keenan's proposed testimony, if presented to the jury, would have been tantamount to allowing him to express a credibility assessment of the statements that Juan made to Detective Porter, a determination that exceeds the permissible scope of any witness's testimony. Here, as in all cases, it is the jury's province to assess and determine the credibility of all witnesses.

Appellant further asserts that Juan's pretrial statements implicated Appellant and comprised a majority of the evidence that the State presented against Appellant at trial. As such, if admitted, Dr. Keenan's testimony would have provided credence to Juan's testimony when Juan recanted his confession. However, Detective Porter was not the only witness to whom Juan had made statements prior to Appellant's trial. Delapaz and Pannell testified about the statements that Juan made to them in connection with his and the others' involvement in the murders of Allen and Doyal. The statements that Roque made about his brother's (Juan's) involvement in the murders were presented to the jury. Further, the jury viewed a video recording from

19

the Hobbs Police Department of Roque talking to his mother and saying that "[t]hey know Juan was there" and that "[Juan] didn't kill them." Therefore, we cannot say, as Appellant suggests, that Dr. Keenan's proposed "expert" opinion—that the statements that Juan made to Detective Porter were involuntary—would have assisted or been helpful to the jury in understanding the evidence.

Because Dr. Keenan's proposed testimony would not have helped the jury to either understand the evidence or to determine a fact in dispute, we hold that the trial court did not abuse its discretion when it excluded Dr. Keenan's testimony. Accordingly, we overrule Appellant's fifth issue on appeal.

C. *Interview of Jerry Castillo by Craig Eldon Whitworth*

In his seventh issue, Appellant complains that the trial court erred when it excluded the testimony of a witness, Craig Eldon Whitworth, that Appellant tendered at trial concerning statements that Jerry Castillo[7] made during an interview with Whitworth.[8]

Whitworth is a private investigator whom Appellant and his trial counsel retained. As part of his investigation, Whitworth interviewed Jerry in Santa Fe, New Mexico, while the latter was incarcerated there in 2017. Whitworth's testimony, as proffered by Appellant's trial counsel, consisted of his interview with Jerry; the purpose of the proffer was purportedly to show that Jerry had received information from Sosa that would confirm Sosa's testimony that Sosa had acted alone in the murders of Allen and Doyal.

Jerry was called as a witness in Appellant's trial; however, he asserted his Fifth Amendment privilege and refused to answer any question that was presented to him

---

[7]The record does not reflect Jerry's relationship with Juan or Roque.

[8]We note that, although Appellant presents his seventh issue as though a transcript of the interview had been excluded, Appellant never offered the transcript as an exhibit or as evidence at trial. Rather, Appellant's substantive complaint is the exclusion of Whitworth's testimony about Jerry's *statements* made to Whitworth during the interview.

20

by the State. Consequently, the State objected to the offer by Appellant's trial counsel to present testimony from Whitworth as to the substance of the statements that were made to him by Jerry during their interview session. The following discussion occurred between trial counsel and the trial court:

[PROSECUTOR]: . . . [Jerry] has been in this courtroom, has been put under oath and he became unavailable because he refused to answer questions. The State has the right to cross-examine about a statement.

THE COURT: Again, with regard to asking him if he took a statement, I don't have any problem with that. He just can't tell what [Jerry] said.

[DEFENSE COUNSEL]: Well, I –

THE COURT: Once he takes the Fifth, that puts the whole thing –

[DEFENSE COUNSEL]: Well, the State doesn't have a Sixth Amendment right to confront and cross-examine witnesses like the Defense does.

THE COURT: I disagree with that. But –

[DEFENSE COUNSEL]: Okay. So is your -- you are gonna' make an objection to him testifying?

[DEFENSE COUNSEL]: The objection is that the witness is --

THE COURT: About what the witness says.

[PROSECUTOR]: So therefore, he cannot, that witness cannot be crossed on any statement that he's given either to the investigator or any other because he was brought in this courtroom in this cause and refused to answer questions.

THE COURT: Doesn't make any difference.

[PROSECUTOR]: Refused to answer questions.

21

[DEFENSE COUNSEL]: Okay. Then I'm gonna' do what the Court said that they'll allow. And that is, not going into the specifics of any conversation.

THE COURT: And you can perfect the bill about that –

[DEFENSE COUNSEL]: Yes. And I'll do that next.

THE COURT: Okay.

Whitworth's interview of Jerry was memorialized in a 48-page transcript, which Appellant submitted as an offer of proof after the trial court sustained the State's objection to Appellant's proffer on the basis that Jerry was "unavailable" for cross-examination by the State.

Appellant now asserts, for the first time on appeal, that Jerry's statements to Whitworth were admissible as statements against interest under Rule 803(24) of the Texas Rules of Evidence. Regardless of whether we agree with Appellant's characterization of these statements, it is undisputed that Appellant did not raise Rule 803(24) to the trial court or rely on this rule's application as a basis for the admissibility of these challenged statements. We may not reverse a trial court's decision on a legal theory that the complaining party did not present to the trial court for consideration. *Hailey v. State*, 87 S.W.3d 118, 122 (Tex. Crim. App. 2002) (noting that, although we may affirm a trial court's evidentiary ruling on a legal theory not presented to the trial court, it violates "ordinary notions of procedural default" to reverse a trial court's ruling on a theory upon which it did not have an opportunity to rule) (quoting *State v. Mercado*, 972 S.W.2d 75, 77–78 (Tex. Crim. App. 1998)); *see also Pierson v. State*, 426 S.W.3d 763, 770 (Tex. Crim. App. 2014) (citing *Vinson v. State*, 252 S.W.3d 336, 340 (Tex. Crim. App. 2008)) (noting that the

proponent of the evidence bears the burden to establish its admissibility). Accordingly, we overrule Appellant's seventh issue on appeal.

## VI.  *Motion for New Trial*

In his sixth issue, Appellant argues that the trial court erred when it denied his motion for new trial.

We review a trial court's ruling on a motion for new trial for an abuse of discretion.  *State v. Herndon*, 215 S.W.3d 901, 906 (Tex. Crim. App. 2007).  In his motion, Appellant asserted that the trial court erred when it excluded the testimony of Dr. Keenan and Whitworth and that the evidence was insufficient to support the jury's verdicts of Appellant's guilt.  We have already addressed each of these arguments on appeal and have found that no error exists.  Therefore, the trial court did not abuse its discretion when it denied Appellant's motion for new trial. Accordingly, we overrule Appellant's sixth issue on appeal.

## VII.  *Evidence Admitted*

Finally, Appellant raises six issues in which he asserts that the trial court erred when it admitted certain evidence proffered by the State.

### A.  *Standard of Review*

We review the trial court's decision to admit evidence under an abuse of discretion standard.  *Rhomer*, 569 S.W.3d at 669; *Coble*, 330 S.W.3d at 272; *Cameron*, 241 S.W.3d at 19 (citing *Montgomery*, 810 S.W.2d at 391); *Walter*, 581 S.W.3d at 977.  This same standard applies when we review a trial court's decision to admit or exclude extraneous evidence.  *De La Paz*, 279 S.W.3d at 343.

As with the exclusion of evidence, we will not reverse a trial court's decision to admit evidence, and the trial court does not abuse its discretion, unless its decision lies outside the zone of reasonable disagreement.  *Beham*, 559 S.W.3d at 478; *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App. 2008); *McCarty v. State*, 257 S.W.3d 238, 239 (Tex. Crim. App. 2008).  Moreover, we will not disturb a trial

court's ruling to admit evidence, even if the trial court's reasoning was flawed, if it is correct on any theory of law that reasonably finds support in the record and is applicable to that ruling. *Henley*, 493 S.W.3d at 93; *De La Paz*, 279 S.W.3d at 344; *Gonzalez*, 195 S.W.3d at 125–26; *Willover v. State*, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002); *Dering*, 465 S.W.3d at 670.

B. *Analysis – Hearsay*

We will first consider three evidentiary issues (Appellant's eighth, ninth, and tenth issues on appeal) in which Appellant contends that the trial court erred when it admitted certain evidence over Appellant's hearsay objections.

1. *Juan Castillo's Statements*

In his eighth issue, Appellant contends that the trial court abused its discretion when it admitted statements that Juan made to Delapaz and to Pannell. Appellant argues that the challenged statements are hearsay and do not fall within the hearsay exception for statements against interest. We disagree.

The general hearsay rule makes inadmissible any out-of-court statement offered in court to prove the truth of the matter asserted. TEX. R. EVID. 801(d). Generally, hearsay evidence is not admissible unless it falls within one or more of the recognized exceptions. *See generally* TEX. R. EVID. 802, 803. One such exception is Rule 803(24), which allows for the admissibility of hearsay testimony when the testimony constitutes a statement against a person's penal interest. *See* TEX. R. EVID. 803(24). Statements against a declarant's penal interest fall into three general categories: (1) self-inculpating statements, (2) statements that equally inculpate the declarant and a third party, and (3) statements that inculpate both the declarant and a third party but shift blame to another by minimizing the speaker's culpability. *Walter v. State*, 267 S.W.3d 883, 890–91 (Tex. Crim. App. 2008).

The rationale behind Rule 803(24) is based on the common-sense assumption that "people ordinarily do not say things that are damaging to themselves unless they

24

believe they are true." *Id*. at 890 (citing *Lilly v. Virginia*, 527 U.S. 116, 126–27 (1999)); *see* Tex. R. Evid. 803(24). Thus, a reasonable person would not normally claim that he committed a crime, unless it were true. *Walter*, 267 S.W.3d at 890 (citing *United States v. Watson*, 525 F.3d 583, 586 (7th Cir. 2008)). Pursuant to Rule 803(24), a two-step foundation requirement must be satisfied before hearsay statements against a person's penal interest may be admitted. *Id.* (citing *Dewberry v. State*, 4 S.W.3d 735, 751 (Tex. Crim. App. 1999); *Bingham v. State*, 987 S.W.2d 54, 57 (Tex. Crim. App. 1999)). First, the trial court must determine whether the statement, considering all of the circumstances, subjects the declarant to criminal liability and whether the declarant realized this risk when he made the statement. *Id*. at 890–91 (citing *Dewberry*, 4 S.W.3d at 751). Second, the trial court must determine whether there are sufficient corroborating circumstances that clearly indicate that the statement is trustworthy. *Id.* at 891 (citing *Dewberry*, 4 S.W.3d at 751; *Bingham*, 987 S.W.2d at 57).

Here, Juan made self-inculpating statements to both Delapaz and Pannell. *See id.* at 890 & n.24 (citing *Williamson v. United States*, 512 U.S. 594, 603–04 (1994) (explaining that context informs whether a statement is self-inculpatory or not)); *see also Woods v. State*, 152 S.W.3d 105, 112 (Tex. Crim. App. 2004). Juan volunteered and expressed to Delapaz a narrative of the events that occurred the night that Allen and Doyal were murdered. He explained that he and three others drove to Allen's house and that he saw Appellant shoot Doyal and Sosa shoot Allen. Juan also made references to Pannell about Allen and stated that the robbery was "a good lick." *See Williamson*, 512 U.S. at 603 ("'Sam and I went to Joe's house' might be against the declarant's interest if a reasonable person in the declarant's shoes would realize that being linked to Joe and Sam would implicate the declarant in Joe and Sam's conspiracy."). These statements are clearly self-inculpating and subject the

declarant, Juan, to criminal liability for the crimes on trial, and the circumstances further indicate that he was aware of and understood this fact.

Furthermore, we cannot agree with Appellant that Juan's statements lack sufficient corroborating circumstances. Crime scene photographs and autopsy evidence confirmed Juan's account of how Allen and Doyal were murdered. Brown testified that Mata, Juan, Sosa, and Appellant went to Allen's house to retrieve the money that Mata wanted to collect from Allen and, thus, confirmed that the murders occurred during the commission of a robbery. Detective Porter testified to the account of the intended robbery and the murders that was expressed to him by Juan. Additionally, the testimony of other witnesses, including Sosa's account of the murders, confirmed that the surveillance equipment was removed from Allen's house. Therefore, we find that the record before us contains sufficient corroborating circumstances that establish the trustworthiness of Juan's statements. S*ee, e.g.*, *Orona v. State*, 341 S.W.3d 452, 465 (Tex. App.—Fort Worth 2011, pet. ref'd) (citing *Walter*, 267 S.W.3d at 899) (coconspirator's statement that he and the appellant beat the victim exposed both to criminal liability, and the trustworthiness of the statement was corroborated by other testimony showing the coconspirator and the appellant had beaten the victim).

Because Juan's statements comport with the hearsay exception requirements of Rule 803(24), we hold that the trial court did not abuse its discretion when it admitted this evidence. Accordingly, we overrule Appellant's eighth issue on appeal.

### 2. *Rollie Cantu's Letter & Estella Collum's Jewelry Appraisal*

In his ninth and tenth issues, Appellant asserts that the trial court abused its discretion when it admitted State's Exhibit No. 15, a letter written by Cantu to Allen, and State's Exhibit No. 14, Estella Collum's jewelry appraisal.

Although Appellant asserted timely hearsay objections to each exhibit, the record does not indicate on what basis the trial court admitted either exhibit. We

have reviewed the record and we agree with Appellant that Cantu's letter was inadmissible hearsay and should have been excluded. We further agree with Appellant, and the State appears to concede, that Collum's jewelry appraisal was also inadmissible hearsay. However, we find that the trial court did not commit reversible error when it admitted this evidence.

The trial court's erroneous admission of evidence generally constitutes nonconstitutional error. *Gonzalez v. State*, 544 S.W.3d 363, 373 (Tex. Crim. App. 2018); *see* TEX. R. APP. P. 44.2(b). As such, we must disregard the error unless it affected Appellant's substantial rights. *See* TEX. R. APP. P. 44.2(b). A substantial right is affected if the error had a substantial and injurious effect or influence in determining the jury's verdict. *Schmutz v. State*, 440 S.W.3d 29, 39 (Tex. Crim. App. 2014). Nevertheless, one's substantial rights are not affected by the erroneous admission of evidence if, after examining the record as a whole, we have fair assurance that the error did not influence the jury or had but a slight effect. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). When we assess the likelihood that the error adversely influenced the jury, we consider the entire record, including (1) the character of the alleged error and how it might be considered in connection with other evidence, (2) the nature of the evidence supporting the verdict, (3) the existence and degree of additional evidence indicating the defendant's guilt, and (4) whether the State emphasized the complained-of error. *Gonzalez*, 544 S.W.3d at 373; *Motilla*, 78 S.W.3d at 355; *Morales v. State*, 32 S.W.3d 862, 867 (Tex. Crim. App. 2000); *see Llamas v. State*, 12 S.W.3d 469, 471 (Tex. Crim. App. 2000).

On both issues, Appellant submits that he was harmed. Appellant asserts that the State was able to use this evidence—Cantu's letter and Collum's jewelry appraisal—to support "its theory that Allen owed [Cantu] a substantial sum of money." Because he was unable to controvert or cross-examine anyone regarding Collum's jewelry appraisal, Appellant argues that the State was able "to present

27

unrebuttable evidence regarding a central theory of its case against" Appellant. We cannot say that either Cantu's letter or Collum's jewelry appraisal were central to the issues in this case.

First, Cantu's letter to Allen makes no reference to any "deal" between Cantu and Appellant. The letter, dated February 3, 2012, was sent to Allen from Cantu while the latter was incarcerated. In the letter, Cantu refers to money that he expected to receive from Allen, purportedly for the diamonds that Allen had sold in New York City. However, Cantu's message in his letter is vague, albeit cordial in tone; it referenced a "black truck [Cantu] never got" and alluded to something concerning a "rope chain." The jury heard phone recordings that contained statements Mata made to Cantu about money Allen owed Mata from the sale of the rings, and other testimony, which we have outlined above, that the murders of Allen and Doyal were incident to the robbery. Therefore, and irrespective of Appellant's assertions, we conclude that we have fair assurance from the record as a whole that the erroneous admission of this evidence did not influence the jury's decisions in this case or, if any, its admission had but a slight effect.

Second, the State submits, and we agree, that Collum's jewelry appraisal did not bear on "any of the real issues of the case." The appraised values of the stolen diamond rings were not relevant to the issues before the jury in Appellant's trial. Taber's mother had her jewelry appraised in 1997 by Harold Brown Jewelry in Hobbs. The appraised value of these diamonds had no relevance to or bearing on the events that preceded, and included, the murders of Allen and Doyal. In fact, Cantu's letter to Allen established that the amount of money that Allen received when he sold the diamonds—let alone the diamonds' appraised values in 1997—was of no consequence to the debt that Allen owed to Cantu. Therefore, although Collum's jewelry appraisal had no bearing on the issues before the jury, we further conclude that we have fair assurance from the record as a whole that the erroneous

28

admission of this evidence did not influence the jury's decisions in this case or, if any, its admission had but a slight effect.

Based on the record before us, we hold that the trial court's erroneous admission of Cantu's letter and Collum's jewelry appraisal did not affect Appellant's substantial rights. Accordingly, we overrule Appellant's ninth and tenth issues on appeal.

C. *Analysis – Rules 402 and 403*

Finally, we consider Appellant's remaining evidentiary challenges (his eleventh, twelfth, and thirteenth issues) in which he contends that the trial court erred when it admitted certain evidence over Appellant's objections on the grounds of relevance and unfair prejudice.

1. *Brown's Testimony*

In his eleventh issue, Appellant contends that the trial court erred when it allowed Brown to testify about (1) an occasion whereby Appellant unlawfully entered Allen's house with Mata without Allen's consent and (2) a vehicular accident in which Appellant struck a child named Abigail. Specifically, Appellant argues that this evidence was irrelevant and unfairly prejudicial.

All relevant evidence is generally admissible. TEX. R. EVID. 402; *see also Layton v. State*, 280 S.W.3d 235, 240 (Tex. Crim. App. 2009). Evidence is relevant if it has any tendency to make a fact of consequence to the determination of the action more or less probable than it would be without the evidence. TEX. R. EVID. 401. Even "marginally probative" evidence should be admitted if "it has any tendency at all, even potentially, to make a fact of consequence more or less likely." *Fuller v. State*, 829 S.W.2d 191, 198 (Tex. Crim. App. 1992) (citing TEX. R. EVID. 401), *abrogated on other grounds by Riley v. State*, 889 S.W.2d 290, 301 (Tex. Crim. App. 1993).

Rule 403 allows a trial court to exclude relevant evidence if its probative value is substantially outweighed by a risk of unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence. TEX. R. EVID. 403. Because Rule 403 favors the admission of relevant evidence, it is presumed that relevant evidence will be "more probative than prejudicial." *Montgomery*, 810 S.W.2d at 389; *see* TEX. R. EVID. 403; *see also De La Paz*, 279 S.W.3d at 343. However, Rule 403 also imposes a duty on the trial court to determine if, on balance, the prejudicial effect of admitting relevant evidence substantially outweighs the probative value of such evidence. *See Casey v. State*, 215 S.W.3d 870, 880 (Tex. Crim. App. 2007); *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006); *see also Montgomery*, 810 S.W.2d at 389.

The intent of Rule 403 is not to exclude all evidence that tends to prejudice the opponent's case. *Davis v. State*, 329 S.W.3d 798, 806 (Tex. Crim. App. 2010). Rather, it only prevents the admission of evidence that promotes a jury's decision on an improper basis. *Id.*; *Montgomery*, 810 S.W.2d at 389. When performing a Rule 403 analysis, factors that the trial court must consider include (1) the probative value of the evidence; (2) the potential for the evidence to impress the jury in some irrational, yet indelible, way or to suggest a decision on an improper basis; (3) the amount of time needed by the proponent to develop the evidence; and (4) the magnitude of the proponent's need for the evidence. *Montgomery*, 810 S.W.2d at 389–90; *see also Hernandez v. State*, 390 S.W.3d 310, 324 (Tex. Crim. App. 2012); *Casey*, 215 S.W.3d at 880 (citing *Gigliobianco*, 210 S.W.3d at 641–42).

The State sought to offer this evidence in connection with its perceived need to establish the "reliability and corroboration" of Brown's statements as a "jailhouse-informant." *See* CRIM. PROC. art. 38.075. During a bench conference on this issue, the State articulated that, "due to the need for corroboration . . . pursuant to the Code [o]f Criminal Procedure, corroboration and reliability of a statement from a jailhouse

30

inmate, the State at this time would ask to be allowed to go into both of these matters that show the reliability and corroboration of her statement." The trial court overruled Appellant's Rule 402 and 403 objections to Brown's testimony regarding these extraneous matters because it concluded that this evidence was relevant to the State's corroboration burden.

However, and as we have previously discussed, the plain and unambiguous language of Article 38.075 foreclosed Brown's status as a "jailhouse-informant" in the trial against Appellant. Therefore, because the State did not bear a corroboration burden with respect to Brown's testimony, this specific evidence was not relevant to any issue that was properly before the jury and should have been excluded. Therefore, based on our holding on this issue, we need not determine whether this evidence was unfairly prejudicial. *See* TEX. R. APP. P. 47.1.

Because the erroneous admission of this evidence constitutes nonconstitutional error, we must disregard it unless we find that its admission affected Appellant's substantial rights. *See* TEX. R. APP. P. 44.2(b). Although these extraneous matters were not relevant to the State's case against Appellant, we believe that we have fair assurance that the erroneous admission of this evidence did not influence the jury's verdicts in this case or, if any, its admission had but a slight effect. As we have said, there is sufficient evidence in the record to support Appellant's convictions. Moreover, the State did not emphasize this testimony during the trial of the case or refer to it during its closing argument. Based on the volume of testimony and other evidence adduced at trial, Brown's statements about these extraneous matters are inconsequential in light of the record as a whole. Therefore, the trial court's erroneous admission of this evidence did not affect Appellant's substantial rights. Accordingly, we overrule Appellant's eleventh issue on appeal.

## 2. *Brown's Handwritten Notes and Statement to Law Enforcement*

In his twelfth issue, Appellant argues that the trial court erred when it admitted State's Exhibit No. 69, Brown's handwritten notes, and State's Exhibit No. 70, Brown's voluntary statement to Ranger Burney.

It is the State's position on appeal that Appellant failed to interpose a clear and specific objection to the admission of these exhibits. We disagree. During the bench conference mentioned above, the State initially directed the trial court's attention to State's Exhibit Nos. 69 and 70 in connection with Brown's testimony, which we have discussed in addressing Appellant's eleventh issue. Appellant's trial counsel clearly articulated Rule 402 and 403 objections when the State announced its intention to offer this evidence, and before the trial court made its ruling as to Brown's testimony. Subsequently, when the State offered Exhibit Nos. 69 and 70 into evidence, Appellant reasserted those objections, which the trial court overruled.

Although the trial court erred when it admitted this evidence, we find that such error did not affect Appellant's substantial rights and, therefore, does not require reversal. *See* TEX. R. APP. P. 44.2(b). The admission of Brown's notes and her statement to Ranger Burney did not enlighten the jury with any new evidence. In fact, the contents of these exhibits were merely cumulative of other evidence that had been previously presented to the jury and admitted by the trial court. As the record before us shows, Brown had previously testified to every statement that was contained in State's Exhibit Nos. 69 and 70. As such, we believe that we have fair assurance that the erroneous admission of this evidence did not influence the jury's verdicts in this case or, if any, its admission had but a slight effect. Moreover, the trial court's error was cured when the same evidence was offered and admitted elsewhere during Appellant's trial. *See Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003); *Johnson v. State*, 803 S.W.2d 272, 291 (Tex. Crim. App. 1990); *Nicholls v. State*, No. 11-19-00120-CR, 2021 WL 1034047, at *4 (Tex. App.—

Eastland March 18, 2021, pet. ref'd). Accordingly, we overrule Appellant's twelfth issue on appeal.

### 3. "[M]ost [H]ated" Gang Evidence

In his final issue, Appellant argues that the trial court erred when it admitted jail photographs of Appellant's tattoos and testimony regarding his affiliation with the "most hated" gang. Specifically, Appellant asserts that the admission of the tattoo photographs and the testimony that linked him to the "most hated" gang was unfairly prejudicial. We disagree.

Appellant's trial counsel objected to the testimony offered by the State concerning Appellant's connection to the "most hated" gang on relevance grounds; the trial court overruled Appellant's objection but granted Appellant a running objection as this evidence was presented. Appellant's trial counsel also objected to the admission of the photographs of Appellant's tattoos on the grounds of relevance and unfair prejudice. *See* TEX. R. EVID. 402, 403. On appeal, although Appellant only advances his argument that the admission of this evidence violated Rule 403, we note that Appellant has cited no cases or other legal authority to support his assertion that the trial court's decision to admit this evidence was erroneous.[9]

Here, the admission of the "most hated" gang evidence was undoubtedly prejudicial to Appellant. *See Hernandez*, 390 S.W.3d at 324 (noting that "[a]ll evidence is prejudicial to one party or the other"). However, to be violative of Rule 403 the evidence must be *unfairly* prejudicial. *See* TEX. R. EVID. 403. "Unfair prejudice" refers to an undue tendency to suggest the jury's decision on an improper basis. *Hernandez*, 390 S.W.3d at 323–24 (citing *Casey*, 215 S.W.3d at 879); *Vasquez v. State*, 67 S.W.3d 229, 240 (Tex. Crim. App. 2002); *Render v. State*, 347

---

[9]We further note that, except for stating the general rules of evidence admissibility, Appellant has failed to cite to any case or other legal authority to support his arguments on any of the evidentiary points—issues seven, eight, nine, ten, eleven, twelve, and thirteen—that he has raised under this heading.

S.W.3d 905, 921 (Tex. App.—Eastland 2011, pet. ref'd). In this case, the potential "improper basis" could arguably raise a character conformity inference—the use of Appellant's affiliation with the "most hated" gang to show that Appellant was a bad person and that he acted in conformity with his bad character. *See, e.g.*, *Vasquez*, 67 S.W.3d at 240.

Irrespective of Appellant's claim of prejudice, the evidence of Appellant's affiliation or membership with the "most hated" gang was also highly probative of Appellant's motive or intent to commit the robbery and the murders of Allen and Doyal. Although generally relevant and admissible only during the punishment phase of a criminal defendant's trial, evidence of gang affiliation or membership may be admissible during the trial's guilt/innocence phase if it is relevant for a noncharacter purpose that in turn tends to show the commission of a crime. *Rawlins v. State*, 521 S.W.3d 863, 868 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) (citing *Tibbs v. State*, 125 S.W.3d 84, 89 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd)). Importantly, evidence of gang affiliation or membership may be admissible during the guilt/innocence phase to show the defendant's motive or intent to commit the charged offense. *See id*. (citing *Smith v. State*, 355 S.W.3d 138, 154 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd)); *see also Vasquez*, 67 S.W.3d at 239–40; *McCallum v. State*, 311 S.W.3d 9, 15 (Tex. App.—San Antonio 2010, no pet.); *Williams v. State*, 974 S.W.2d 324, 331 (Tex. App.—San Antonio 1998, pet. ref'd). Furthermore, gang affiliation or membership may be established by the display of a defendant's tattoos or other symbols that are representative of such affiliation or membership. *Barrera v. State*, 321 S.W.3d 137, 153 (Tex. App.—San Antonio 2010, pet. ref'd); *Garcia v. State*, 239 S.W.3d 862, 866–67 (Tex. App.—Houston [1st Dist. 2007, pet. ref'd).

Nevertheless, and in light of the record before us, we hold that the trial court did not abuse its discretion when it concluded that, on balance, the probative value

of this evidence—to show Appellant's motive or intent to commit the robbery and the murders of Allen and Doyal—was not substantially outweighed by the risk of unfair prejudice.  Accordingly, we overrule Appellant's thirteenth issue on appeal.

## VIII.  *This Court's Ruling*

We affirm the judgments of the trial court.

W. STACY TROTTER

JUSTICE

July 30, 2021

Publish.  *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.